**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| UNITED STATES OF AMERICA; THE STATE OF CALIFORNIA; THE STATE OF INDIANA; THE STATE OF MARYLAND; THE STATE OF NEVADA; THE STATE OF NEW MEXICO; and THE STATE OF TEXAS *ex rel.* KATRINA WILSON, <br><br> Plaintiffs, <br><br> vs. <br><br> FUNDAMENTAL LONG TERM CARE HOLDINGS, LLC; FUNDAMENTAL ADMINISTRATIVE SERVICES, LLC; FUNDAMENTAL CLINICAL AND OPERATIONAL SERVICES, LLC; ALAMO HEIGHTS HEALTH CARE LLC d/b/a ALAMO HEIGHTS HEALTH AND REHABILITATION CENTER; BALLWIN HEALTH CARE LLC d/b/a BALLWIN RIDGE HEALTH & REHABILITATION; BEHAVIORAL HEALTH SERVICES OF NEW MEXICO LLC d/b/a CENTRAL DESERT BEHAVIORAL HEALTH CENTER; BREMOND HEALTH CARE LLC d/b/a BREMOND NURSING AND REHABILITATION CENTER; BROWNFIELD HEALTH CARE LLC d/b/a BROWNFIELD REHABILITATION AND CARE CENTER; BROWNSVILLE LONG TERM CARE, LLC d/b/a THE HILLCREST OF NORTH DALLAS; BRYANT IRVIN CONSULTING LLC d/b/a MIRA VISTA COURT; SAINT MATTHEWS HEALTH CARE, LLC d/b/a CALHOUN CONVALESCENT CENTER; CANTON LONG TERM CARE, LLC d/b/a CANTON OAKS; CARE INN OF ABILENE LLC d/b/a WILLOW SPRINGS HEALTH AND REHABILITATION CENTER; CARE INN OF EDNA LLC d/b/a EDGEWOOD REHABILITATION AND CARE CENTER; CARE INN OF LLANO LLC d/b/a ESTRELLA OAKS REHABILITATION AND CARE CENTER; CARE INN OF SANGER LLC d/b/a SANDY LAKE REHABILITATION & CARE CENTER; CARE INN OF SEGUIN LLC d/b/a SAN GABRIEL REHABILITATION & CARE CENTER; CASA ARENA BLANCA, LLC d/b/a CASA ARENA BLANCA NURSING CENTER; CASA MARIA OF NEW MEXICO, LLC d/b/a CASA MARIA HEALTH CARE CENTER AND PECOS VALLEY | Civil Action No. _____ <br><br><br><br><br><br> **FILED UNDER SEAL** <br> **Pursuant to 31 U.S.C.** <br> **§ 3730** |

REHAB; CHAMBERSBURG HEALTH CARE LLC d/b/a )
LIBERTY HEALTH AND WELLNESS; CORINTH )
HEALTH CARE LLC d/b/a CORINTH )
REHABILITATION SUITES ON THE PARKWAY; )
CORSICANA HEALTH CARE LLC d/b/a COUNTRY )
MEADOWS NURSING AND REHABILITATION )
CENTER; CRESTVIEW MANOR NURSING AND )
REHABILITATION CENTER LLC d/b/a CREEKSIDE )
TERRACE REHABILITATION; CROSBYTON LONG )
TERM CARE LLC d/b/a CROSBYTON NURSING AND )
REHABILITATION CENTER; DESERT VIEW HOME )
HEALTH, INC. d/b/a DESERT VIEW HOME HEALTH, )
INC.; DENISON LONG TERM CARE, LLC d/b/a )
WOODLANDS PLACE REHABILITATION SUITES; )
FALLING SPRING NURSING AND REHABILITATION )
CENTER, L. P. d/b/a FALLING SPRING NURSING )
AND REHABILITATION CENTER; FMSC VICTORIA )
OPERATING COMPANY LP d/b/a RETAMA MANOR )
CENTER/ VICTORIA SOUTH; HARRISONVILLE )
LONG TERM CARE, LLC d/b/a ABC HEALTH CARE; )
HARRISONVILLE SENIOR CARE, LLC d/b/a )
MEADOW VIEW OF HARRISONVILLE HEALTH & )
REHAB; IOWA PARK LLC d/b/a IOWA PARK )
HEALTHCARE CENTER; KARISSA HEALTH CARE )
LLC d/b/a BRIDGECREST REHABILITATION SUITES; )
KATY LONG TERM CARE, LLC d/b/a STERLING )
OAKS REHABILITATION; KIRKLAND COURT )
HEALTH CARE LLC d/b/a KIRKLAND COURT )
HEALTH AND REHABILITATION CENTER; )
LANCASTER HEALTH CARE LLC d/b/a LANCASTER )
CONVALESCENT CENTER; LEE'S SUMMIT HEALTH )
CARE LLC d/b/a LEE'S SUMMIT POINTE HEALTH & )
REHABILITATION; LEXINGTON LONG TERM CARE )
LLC d/b/a RIVERBEND HEIGHTS HEALTH & )
REHABILITATION; MAJOR HOSPITAL d/b/a )
BELLTOWER HEALTH AND REHABILITATION )
CENTER; MANSFIELD LONG TERM CARE, LLC d/b/a )
THE PAVILLION AT CREEKWOOD; MARKET PLACE )
HEALTHCARE, LLC d/b/a THE BRAZOS OF WACO; )
MEADOWBROOK HEALTH CARE LLC d/b/a )
MEADOWBOOK CARE CENTER; MID-ATLANTIC )
HEALTH CARE LLC d/b/a ALLEGANY HEALTH )
NURSING AND REHABILITATION, BERLIN )
NURSING AND REHABILITATION, CHAPEL HILL )
NURSING AND REHABILITATION, DEVLIN MANOR )
NURSING AND REHABILITATION CENTER, )

2

FAIRFIELD NURSING AND REHABILITATION CENTER, FOREST HAVEN NURSING HOME CENTER, MORAN NURSING AND REHABILITATION CENTER, NORTHAMPTON MANOR NURSING AND REHABILITATION, OAKLAND NURSING REHABILITATION CENTER, RESTORE HEALTH REHABILITATION CENTER, and VILLA ROSA NURSING AND REHABILITATION; MOBERLY HEALTH CARE, LLC d/b/a VALLEY VIEW HEALTH & REHABILITATION; MONETT HEALTHCARE LLC d/b/a BENTONVIEW PARK HEALTH AND REHABILITATION; RAYTOWN HEALTH CARE, LLC d/b/a AUTUMN TERRACE HEALTH & REHABILITATION; RED BLUFF LLC d/b/a THE COURTYARDS AT PASADENA; REHAB CENTER OF CHERAW LLC d/b/a CHESTERFIELD CONVALESCENT CENTER; RETAMA MANOR DEL RIO LLC d/b/a FALCON RIDGE REHABILITATION; RIVER VALLEY HEALTH CARE LLC d/b/a RIVER VALLEY HEALTH & REHABILITATION CENTER; ROLLA HEALTH CARE LLC d/b/a ROLLA HEALTH & REHABILITATION SUITES; SPARTANBURG HEALTH CARE LLC d/b/a VALLEY FALLS TERRACE; SPRING VALLEY HEALTH CARE, LLC d/b/a SPANISH HILLS WELLNESS SUITES; ST CHARLES HEALTH CARE LLC d/b/a FRONTIER HEALTH & REHABILITATION; ST LOUIS HEALTH CARE LLC d/b/a ST. LOUIS PLACE HEALTH & REHABILITATION; STRATFORD HOSPITAL DISTRICT MANAGEMENT GROUP d/b/a HILLSIDE HEIGHTS REHABILITATION SUITES, LAKESIDE REHABILITATION AND CARE CENTER, and PLAINVIEW HEALTHCARE CENTER; TEXOMA LONG TERM CARE, LLC d/b/a THE TERRACE AT DENISON; THI OF MISSOURI AT GRAVOIS, LLC d/b/a SUNSET HILLS HEALTH AND REHABILITATION CENTER; THI OF NEVADA AT CHEYENNE, LLC d/b/a COLLEGE PARK REHABILITATION CENTER; THI OF NEVADA AT HEARTHSTONE, LLC d/b/a HEARTHSTONE OF NORTHERN NEVADA; THI OF NEVADA AT LAS VEGAS I, LLC d/b/a HARMON HOSPITAL; THI OF NEVADA II AT DESERT LANE, LLC d/b/a HORIZON HEALTH AND REHABILITATION CENTER, HORIZON SPECIALTY HOSPITAL OF HENDERSON, and HORIZON SPECIALTY HOSPITAL OF LAS

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

3

VEGAS; THI OF NEVADA II AT NORTH LAS VEGAS, )
LLC d/b/a NORTH LAS VEGAS CARE CENTER; THI )
OF NEW MEXICO AT SUNSET VILLA, LLC d/b/a )
SUNSET VILLA CARE CENTER; THI OF )
PENNSYLVANIA AT MOUNTAINVIEW, LLC d/b/a )
MOUNTAINVIEW SPECIALTY CARE CENTER; THI )
OF SOUTH CAROLINA AT CAMP CARE, LLC d/b/a )
LAKE EMORY POST ACUTE CARE; THI OF SOUTH )
CAROLINA AT CHARLESTON, LLC d/b/a RIVERSIDE )
HEALTH AND REHAB; THI OF SOUTH CAROLINA )
AT COLUMBIA, LLC d/b/a MIDLANDS HEALTH & )
REHABILITATION CENTER; THI OF SOUTH )
CAROLINA AT GREENVILLE, LLC d/b/a MAGNOLIA )
MANOR – GREENVILLE; THI OF SOUTH CAROLINA )
AT GREENVILLE, LLC d/b/a MAGNOLIA MANOR – )
GREENWOOD; THI OF SOUTH CAROLINA AT )
HILLTOP LLC d/b/a MONARCH PAVILION )
REHABILITATION SUITES; THI OF SOUTH )
CAROLINA AT MAGNOLIA MANOR INMAN, LLC )
d/b/a MAGNOLIA MANOR – INMAN; THI OF SOUTH )
CAROLINA AT MAGNOLIA PLACE AT )
GREENVILLE, LLC d/b/a MAGNOLIA PLACE OF )
GREENVILLE; THI OF SOUTH CAROLINA AT )
MAGNOLIA PLACE AT SPARTANBURG, LLC d/b/a )
PHYSICAL REHAB & WELLNESS CENTER OF )
SPARTANBURG; THI OF SOUTH CAROLINA AT )
ROCK HILL, LLC d/b/a MAGNOLIA MANOR - ROCK )
HILL; THI OF SOUTH CAROLINA AT )
SPARTANBURG, LLC d/b/a MAGNOLIA MANOR OF )
SPARTANBURG; THI OF TEXAS AT RICHARDSON, )
LLC d/b/a THE VILLAGE AT RICHARDSON; THI OF )
WISCONSIN AT HARTFORD, LLC d/b/a THE )
PAVILION AT GLACIER VALLEY; VEGAS )
HOSPITAL CARE, LLC d/b/a MOUNTAIN'S EDGE )
HOSPITAL; VILLA HAVEN HEALTH CARE LLC d/b/a )
VILLA HAVEN HEALTH AND REHABILITATION )
CENTER; ALMADEN HEALTH & REHAB CENTER; )
AUTUMN HILLS HEALTH CARE CENTER; )
COURTYARDS OF PASADENA; CREEKSIDE )
HEALTH CARE CENTER; DOUBLE TREE POST )
ACUTE CARE; DRIFTWOOD HEALTH CARE – )
HAYWARD; DRIFTWOOD HEALTHCARE SANTA )
CRUZ; FREMONT HEALTH CARE CENTER; )
FRONTIER HEALTH & REHAB; FRUITVALE )
HEALTH CARE CENTER; GREENERY SPCC- )
CANONSBURG; HAYWARD HILLS HEALTHCARE )

4

CENTER; HERITAGE OAKS; HERITAGE PLACE; )
INGLEWOOD HEALTHCARE CENTER; LEES )
SUMMIT POINTE HEALTH & REHABILITATION; )
MEADOWBROOK CARE CENTER; MONTEREY )
PALMS HEALTH CARE CENTER; PALM SPRINGS )
HEALTH & REHABILITATION; PARKVIEW )
HEALTHCARE CENTER; PINE RIDGE CARE )
CENTER; REHAB CENTER OF SANTA MONICA; )
SANTA MONICA HEALTH CARE CENTER; SKYLINE )
HEALTHCARE – SAN JOSE; SOUTHERN NEVADA )
MED & REHAB CENTER; TUCKER HOUSE NURSING )
AND REHABILITATION; VALE HEALTHCARE )
CENTER; VERDUGO VISTA HEALTHCARE CENTER; )
WINTERHAVEN HEALTHCARE CENTER; )
WOODLAKE NURSING HOME; JULIA MANOR )
NURSING AND REHABILITATION CENTER; )
SHIPPENSBURG HEALTH CARE CENTER; CEDAR )
POINTE HEALTH AND WELLNESS SUITES; and )
SPANISH TRAILS REHABILITATION SUITES )
)
Defendants. )
)

## COMPLAINT

1. *Qui tam* relator Katrina Wilson ("Relator") brings this action under the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.* ("FCA") on behalf of the United States of America; on behalf of the State of Texas under the Texas Medicaid Fraud Prevention Act ("TMFPA"), Tex. Hum. Res. Code § 36.002 *et seq.*; on behalf of the State of Nevada under the Nevada False Claims Act, N.R.S. § 357.010 *et seq.* ("NVFCA"); on behalf of the State of New Mexico under the New Mexico Medicaid False Claims Act ("NMMFCA") and the New Mexico Fraud Against Taxpayers Act ("NMFATA"), N.M. Stat. § 27-14-1 *et seq.* and N.M. Stat. § 44-9-1 *et seq.*, respectively; on behalf of the State of Indiana under the Indiana False Claims and Whistleblower Protection Act ("IFCWPA"), Ind. Code 5-11-5.5 *et seq.*; on behalf of the State of Maryland under the Maryland False Health Claims Act ("MFHCA"), Md. Code Health – General § 2-601 *et seq.*; and on behalf of the State of California under the California False Claims Act ("CFCA"), Cal. Gov't Code §

5

12650 *et seq.* (collectively, with Relator, "Plaintiffs"), against Defendants Fundamental Long Term Care Holdings, LLC, Fundamental Administrative Services, LLC, Fundamental Clinical and Operational Services, LLC, and various skilled nursing facilities owned in whole or in part by those entities (together, "Fundamental" or "Defendants"), as set forth with further specificity herein. Relator's allegations are based upon her own independent knowledge and upon an investigation undertaken by her through counsel. Relator alleges as follows:

## NATURE OF THE CASE

2. This *qui tam* action is an effort to restore to the United States millions of dollars Defendants have taken through a systemic and longstanding fraud, perpetrated through Medicare Parts A and B and through Medicaid.

3. Medicare and Medicaid reimburse providers of medical services only to the extent that such services are medically necessary and are actually provided. Defendants herein engage in a complex scheme to defraud the Government by submitting claims for reimbursement for services that are not medically necessary, or were not provided at all, to, *inter alia*, the Medicare and Medicaid programs.

4. Among other things, Fundamental: 1) inappropriately admits patients or retains them longer than medically necessary to their detriment and discomfort, causing false claims to be submitted for unnecessary care; 2) misrepresents the resource utilization group ("RUG") scores of its patient population by artificially inflating the reported activities of daily living ("ADL") scores upon which RUG scores are based, thereby submitting for more reimbursement than it is rightfully owed; 3) fraudulently bills group therapy as individual therapy sessions in order to maximize reimbursement; and 4) employs a widespread practice of reusing disposable equipment and engages in practices of understaffing in order to save on costs, in violation of the Nursing Home Reform Act.

5.      In addition to, and in furtherance of the aforementioned fraud perpetrated upon the Government, Fundamental systematically retaliates against employees who oppose these practices, up to and including terminating those employees who refuse to participate in the fraud. Fundamental has engaged in such retaliatory actions against, among others, the Relator in this action.

6.      Fundamental's scheme has occurred in many states throughout the country, has gone on for years and, on information and belief, continues to this day.

## JURISDICTION AND VENUE

7.      Relator brings this action on behalf of the United States under the *qui tam* provisions of the FCA, and on behalf of the States of California, Indiana, Maryland, Nevada, New Mexico, and Texas under the *qui tam* provisions of, respectively, the California False Claims Act, the Indiana False Claims and Whistleblower Protection Act, the Maryland False Claims Act, the Nevada False Claims Act, the New Mexico False Claims Act and the New Mexico Fraud Against Taxpayers Act, and the Texas Medicaid Fraud Prevention Act.

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 31 U.S.C. §§ 3732(a), which confer jurisdiction over actions brought under 31 U.S.C §§ 3729 and 3730.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367 and 31 U.S.C. § 3732(b).

9.      This Court has personal jurisdiction over Defendants, and venue is proper in this District pursuant to 31 U.S.C. § 3732(a), because Defendants transacted business and committed violations of 31 U.S.C. § 3729 in this District.

10.     This action is not based upon prior public disclosure of allegations or transactions in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party; in a congressional, Government Accountability Office, or other Federal report, hearing,

7

audit, or investigation; in the news media; or in any other form as the term "publicly disclosed" is defined in 31 U.S.C. § 3730(e)(4)(A).

11.    To the extent there has been a public disclosure unknown to Relator, she is an original source under all relevant statutory provisions.  Relator, prior to any such public disclosure, voluntarily disclosed to the Government the information on which her allegations are based and/or has knowledge that is independent of, and materially adds to, the publicly disclosed allegations or transactions and voluntarily provided the information to the Government before filing this action.

## PARTIES

### A.    RELATOR

12.    Relator Katrina Wilson is a natural person residing in the state of Texas.  Ms. Wilson has been a registered nurse ("RN") since 1995.  Until she was wrongfully discharged in July of 2016, she was the Director of Nursing ("DON") at Bridgecrest Rehabilitation Suites ("Bridgecrest") in Houston, Texas, where she had been employed for several years.  Through her employment with Fundamental, Ms. Wilson gained first-hand knowledge of the fraud described herein.

### B.    THE FUNDAMENTAL DEFENDANTS

13.    Defendant Fundamental Long Term Care Holdings, LLC, ("Fundamental Holdings"), is a limited liability corporation organized and existing under the laws of the state of Delaware with its headquarters and principal place of business located at 920 Ridgebrook Road, Sparks, MD 21152.

14.    Defendant Fundamental Administrative Services, LLC ("Fundamental Administrative") is a limited liability corporation organized and existing under the laws of the state of Delaware with its headquarters and principal place of business located at 920 Ridgebrook Road,

Sparks, MD 21152. Together with Fundamental Clinical, Fundamental Administrative owns and operates the nursing home facilities named in paragraphs 18-28.

15.    Defendant Fundamental Clinical and Operational Services, LLC ("Fundamental Clinical") is a limited liability corporation organized and existing under the laws of the state of Delaware with its headquarters and principal place of business located at 920 Ridgebrook Road, Sparks, MD 21152. Together with Fundamental Administrative, Fundamental Clinical owns and operates the nursing home facilities named in paragraphs 18-28.

16.    On information and belief, the three entities named above are alter-egos of one another, with no meaningful distinction between them. This conclusion is bolstered by, *inter alia*, the following: a) Fundamental Long Term Holding's website lists, as facilities it owns and operates, various facilities that are owned in whole or in part by either Fundamental Clinical or Fundamental Administrative; b) witnesses at the various facilities operated by Fundamental have been unable to identify precisely which of the three entities employs them; c) the three entities have the same office address.

17.    Fundamental Holdings, Fundamental Administrative, and Fundamental Clinical collectively own and operate skilled nursing facilities in each of the states named herein as a plaintiff, as well as in Missouri, Pennsylvania, South Carolina, and Wisconsin. Through those facilities, these three entities provide a variety of healthcare services, including skilled nursing; sub-acute care, such as wound management, surgical recovery, pulmonary, rehabilitation, and renal services; basic medical care, outpatient and Alzheimer's and related disorders; specialty hospital services in the areas of diagnostic, nutritional and psycho-social support, cardiopulmonary, pharmacy, physical and occupational therapy, and speech-language pathology; and assisted living. It also provides inpatient, ambulatory, physician, respiratory, mobile

diagnostic, hospice and residential care, respite and end-of-life care, infectious disease support/management, oncology management, pre-transplant and post-transplant, ventilator management, therapeutics and pain management, neurological, and orthopedics.

18. Attached hereto as Exhibit A and incorporated as though set forth fully herein, is a list of each Facility Defendant, as well as that Defendant's place of business and which of the above entities owns each facility. That information was taken from the cost reports filed by the various facilities with CMS.

## C.   THE FACILITY DEFENDANTS

19. The "California Facilities" includes Almaden Health & Rehab Center; Autumn Hills Health Care Center; Creekside Health Care Center; Double Tree Post Acute Care; Driftwood Health Care – Hayward; Driftwood Healthcare Santa Cruz; Fremont Health Care Center; Fruitvale Health Care Center; Hayward Hills Healthcare Center; Inglewood Healthcare Center; Monterey Palms Health Care Center; Palm Springs Health & Rehabilitation; Parkview Healthcare Center; Pine Ridge Care Center; Rehab Center Of Santa Monica; Santa Monica Health Care Center; Skyline Healthcare – San Jose; Vale Healthcare Center; Verdugo Vista Healthcare Center.

20. The "Indiana Facilities" includes Major Hospital d/b/a BellTower Health and Rehabilitation Center.

21. The "Maryland Facilities" includes Mid-Atlantic Health Care LLC d/b/a Allegany Health Nursing and Rehabilitation; Berlin Nursing And Rehabilitation; Chapel Hill Nursing and Rehabilitation; Devlin Manor Nursing and Rehabilitation Center; Fairfield Nursing and Rehabilitation Center; Forest Haven Nursing Home Center; Julia Manor Nursing and Rehabilitation Center; Moran Nursing and Rehabilitation Center; Northampton Manor Nursing and Rehabilitation; Oakland Nursing Rehabilitation Center; Restore Health Rehabilitation Center; and Villa Rosa Nursing and Rehabilitation.

10

22.    The "Missouri Facilities" includes Ballwin Health Care LLC d/b/a Ballwin Ridge Health & Rehabilitation; Chambersburg Health Care LLC d/b/a Liberty Health and Wellness; Harrisonville Long Term Care, LLC d/b/a ABC Health Care; Harrisonville Senior Care, LLC d/b/a Meadow View of Harrisonville Health & Rehab; Lee's Summit Health Care LLC d/b/a Lee's Summit Pointe Health & Rehabilitation; Lexington Long Term Care LLC d/b/a Riverbend Heights Health & Rehabilitation; Moberly Health Care, LLC d/b/a Valley View Health & Rehabilitation; Monett Healthcare LLC d/b/a Bentonview Park Health and Rehabilitation; Raytown Health Care, LLC d/b/a Autumn Terrace Health & Rehabilitation; Rolla Health Care LLC d/b/a Rolla Health & Rehabilitation Suites; St Charles Health Care LLC d/b/a Frontier Health & Rehabilitation; St Louis Health Care LLC d/b/a St. Louis Place Health & Rehabilitation; Thi Of Missouri At Gravois, LLC d/b/a Sunset Hills Health and Rehabilitation Center; Frontier Health & Rehab; and Lees Summit Pointe Health & Rehabilitation.

23.    The "New Mexico Facilities" includes Behavioral Health Services of New Mexico LLC d/b/a Central Desert Behavioral Health Center; Casa Arena Blanca, LLC d/b/a Casa Arena Blanca Nursing Center; Casa Maria of New Mexico, LLC d/b/a Casa Maria Health Care Center and Pecos Valley Rehab; Thi of New Mexico at Sunset Villa, LLC d/b/a Sunset Villa Care Center; and Spanish Trails Rehabilitation Suites.

24.    The "Nevada Facilities" includes Desert View Home Health, Inc. d/b/a Desert View Home Health, Inc.; Spring Valley Health Care, LLC d/b/a Spanish Hills Wellness Suites; Thi of Nevada At Cheyenne, LLC d/b/a College Park Rehabilitation Center; Thi of Nevada At Hearthstone, LLC d/b/a Hearthstone of Northern Nevada; Thi of Nevada At Las Vegas I, LLC d/b/a Harmon Hospital; Thi of Nevada II At Desert Lane, LLC d/b/a Horizon Health and Rehabilitation Center, Horizon Specialty Hospital of Henderson, Horizon Specialty Hospital of

11

Las Vegas; Thi of Nevada II at North Las Vegas, LLC d/b/a North Las Vegas Care Center; Vegas Hospital Care, LLC d/b/a Mountain's Edge Hospital; and Southern Nevada Med & Rehab Center.

25.　　The "Pennsylvania Facilities" includes Falling Spring Nursing and Rehabilitation Center, LP d/b/a Falling Spring Nursing and Rehabilitation Center; Thi of Pennsylvania at Mountainview, LLC d/b/a Mountainview Specialty Care Center; Greenery SSPCC-Canonsburg; Tucker House Nursing And Rehabilitation; and Shippensburg Health Care Center.

26.　　The "South Carolina Facilities" includes Saint Matthews Health Care, LLC d/b/a Calhoun Convalescent Center; Lancaster Health Care LLC d/b/a Lancaster Convalescent Center; Rehab Center Of Cheraw LLC d/b/a Chesterfield Convalescent Center; Spartanburg Health Care LLC d/b/a Valley Falls Terrace; Thi of South Carolina at Camp Care, LLC d/b/a Lake Emory Post Acute Care; Thi of South Carolina at Charleston, LLC d/b/a Riverside Health and Rehab; Thi Of South Carolina At Columbia, LLC d/b/a Midlands Health & Rehabilitation Center; Thi of South Carolina at Greenville, LLC d/b/a Magnolia Manor – Greenville; Thi of South Carolina at Greenville, LLC d/b/a Magnolia Manor – Greenwood; Thi of South Carolina at Magnolia Manor Inman, LLC d/b/a Magnolia Manor – Inman; Thi of South Carolina at Magnolia Place at Greenville, LLC d/b/a Magnolia Place of Greenville; Thi of South Carolina at Magnolia Place at Spartanburg, LLC d/b/a Physical Rehab & Wellness Center of Spartanburg; Thi of South Carolina at Rock Hill, LLC d/b/a Magnolia Manor - Rock Hill; Thi of South Carolina at Spartanburg, LLC d/b/a Magnolia Manor of Spartanburg.

27.　　The "Texas Facilities" includes Alamo Heights Health Care LLC d/b/a Alamo Heights Health and Rehabilitation Center; Bremond Health Care LLC d/b/a Bremond Nursing and Rehabilitation Center; Brownfield Health Care LLC d/b/a Brownfield Rehabilitation and Care Center; Brownsville Long Term Care, LLC d/b/a The Hillcrest of North Dallas; Bryant Irvin

12

Consulting LLC d/b/a Mira Vista Court; Canton Long Term Care, LLC d/b/a Canton Oaks; Care Inn of Abilene LLC d/b/a Willow Springs Health and Rehabilitation Center; Care Inn Of Edna LLC d/b/a Edgewood Rehabilitation and Care Center; Care Inn of Llano LLC d/b/a Estrella Oaks Rehabilitation and Care Center; Care Inn of Sanger LLC d/b/a Sandy Lake Rehabilitation & Care Center; Care Inn of Seguin LLC d/b/a San Gabriel Rehabilitation & Care Center; Corinth Health Care LLC d/b/a Corinth Rehabilitation Suites on the Parkway; Corsicana Health Care LLC d/b/a Country Meadows Nursing and Rehabilitation Center; Crestview Manor Nursing and Rehabilitation Center LLC d/b/a Creekside Terrace Rehabilitation; Crosbyton Long Term Care LLC d/b/a Crosbyton Nursing and Rehabilitation Center; Denison Long Term Care, LLC d/b/a Woodlands Place Rehabilitation Suites; Fmsc Victoria Operating Company LP d/b/a Retama Manor Center/ Victoria South; Iowa Park LLC d/b/a Iowa Park Healthcare Center; Karissa Health Care LLC d/b/a Bridgecrest Rehabilitation Suites; Katy Long Term Care, LLC d/b/a Sterling Oaks Rehabilitation; Kirkland Court Health Care LLC d/b/a Kirkland Court Health and Rehabilitation Center; Mansfield Long Term Care, LLC d/b/a The Pavillion at Creekwood; Market Place Healthcare, LLC d/b/a The Brazos of Waco; Meadowbrook Health Care LLC d/b/a Meadowbook Care Center; Red Bluff LLC d/b/a The Courtyards at Pasadena; Retama Manor Del Rio LLC d/b/a Falcon Ridge Rehabilitation; River Valley Health Care LLC d/b/a River Valley Health & Rehabilitation Center; Stratford Hospital District Management Group d/b/a Hillside Heights Rehabilitation Suites, Lakeside Rehabilitation and Care Center, and Plainview Healthcare Center; Texoma Long Term Care, LLC d/b/a The Terrace at Denison; Thi Of South Carolina At Hilltop LLC d/b/a Monarch Pavilion Rehabilitation Suites; Thi Of Texas At Richardson, LLC d/b/a The Village at Richardson; Villa Haven Health Care LLC d/b/a Villa Haven Health and Rehabilitation Center; Courtyards Of Pasadena; Heritage Oaks; Heritage Place; Meadowbrook Care Center;

13

Winterhaven Healthcare Center; Woodlake Nursing Home; and Cedar Pointe Health And Wellness Suites.

28.     The "Wisconsin Facilities" includes Thi of Wisconsin at Hartford, LLC d/b/a The Pavilion at Glacier Valley.

29.     Unless otherwise stated, the three entities, Fundamental Holdings, Fundamental Administrative, and Fundamental Clinical, listed in paragraphs 13-16, and the facility defendants, listed in paragraphs 18-28, will be referred to as "Fundamental" or "Defendants."

## D.     THE UNITED STATES AND STATE PLAINTIFFS

30.     The United States is a real party in interest under the FCA and ultimately paid the false claims alleged herein – Medicare claims in full and Medicaid claims in part – and is entitled to the bulk of the recovery sought by this action.  Medicare is a federal health insurance program administered by CMS for the elderly and disabled.  *See* 42 U.S.C. §§ 1395-1395hhh.  Medicaid is a jointly-funded federal and state public-assistance program that pays for certain medical expenses incurred by low-income patients.  *See* 42 U.S.C. §§ 1396-1396v.

31.     The State of Texas is a real party in interest under the Texas Medicaid Fraud Prevention Act ("TMFPA") and ultimately paid a portion of the false Medicaid claims alleged herein.  *See* 42 U.S.C. §§ 1396-1396v.  *See* also Tex. Hum. Res. Code § 36.002 *et seq.*  Texas's defrauded Medicaid program is administered and supervised by the Health and Human Services Commission, which is responsible for administering several Texas state departments that deal with health and human services, including itself and the Texas Department of Aging and Disability Services, Texas Department of State Health Services, and the Texas Department of Family and Protective Services.

14

32. The State of California is a real party in interest under the California False Claims Act and ultimately paid a portion of the false Medicaid claims alleged herein. *See* 42 U.S.C. §§ 1396-1396v. *See* also Cal. Gov't Code § 12650 *et seq*.

33. The State of Nevada is a real party in interest under the Nevada False Claims Act and ultimately paid a portion of the false Medicaid claims alleged herein. *See* 42 U.S.C. §§ 1396-1396v. *See* also N.R.S § 357.010 *et seq*.

34. The State of Indiana is a real party in interest under the Indiana False Claims and Whistleblower Protection Act and ultimately paid a portion of the false Medicaid claims alleged herein. *See* 42 U.S.C. §§ 1396-1396v. *See* also Ind. Code 5-11-5.5 *et seq*.

35. The State of Maryland is a real party in interest under the Maryland False Health Claims Act and ultimately paid a portion of the false Medicaid claims alleged herein. *See* 42 U.S.C. §§ 1396-1396v. *See* also Md. Code Health – General § 2-601 *et seq*.

36. The State of New Mexico is a real party in interest under the New Mexico Medicaid False Claims Act and the New Mexico Fraud Against Taxpayers Act, and ultimately paid a portion of the false Medicaid claims alleged herein. *See* 42 U.S.C. §§ 1396-1396v. *See* also N.M. Stat. § 27-14-1 *et seq*. and the New Mexico Fraud Against Taxpayers Act, N.M. Stat. § 44-9-1 *et seq*.

37. For brevity, the United States and the states listed in paragraphs 30 through 36 are referred to collectively as "the Government."

38. Unless otherwise stated, "Plaintiffs" is intended to include both the Government and Relator.

### RELEVANT STATUTES AND REGULATIONS

#### A. FALSE CLAIMS ACT

39. The FCA imposes liability on any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval ("false claim"). 31 U.S.C.

15

§ 3729(a)(1)(A).  The FCA defines "claim" to include any request or demand, whether under contract or otherwise, for money, that is made to an agent of the United States or to a contractor, if the money is to be spent to advance a government program or interest and the government provides or will reimburse any portion of the money.  31 U.S.C. § 3729(b)(2).  The FCA defines "knowingly" to mean actual knowledge, deliberate ignorance of truth or falsity, or reckless disregard of truth or falsity; specific intent to defraud is not required.  31 U.S.C. § 3729(b)(1).

40.    The FCA further imposes liability on any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim ("false statement").  31 U.S.C. § 3729(a)(1)(B).  The FCA defines "material" to mean having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property. 31 U.S.C. § 3729(b)(4).

41.    The FCA also imposes liability on any person who conspires to commit violations on its prohibitions upon false claims or false statements ("conspiracy claim").  31 U.S.C. § 3729(a)(1)(C).

42.    The FCA also imposes liability on any person who knowingly makes or uses a false records or statements that are material to an obligation to pay or transmit money or property to the United States Government through Medicare/Medicaid ("Reverse False Claim").  31 U.S.C. § 3729(a)(1)(G).

43.    Finally, the FCA imposes liability on any employer who has "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against [an employee] in the terms and conditions of employment because of lawful acts done by the employee. . .in furtherance of an action under [the FCA] or other efforts to stop 1 or more violations of" the FCA. 31 U.S.C.S. § 3730(h).

16

**B.      TEXAS MEDICAID FRAUD PREVENTION ACT**

44.      The Texas Medicaid Fraud Prevention Act ("TMFPA") in relevant part, makes it unlawful to do any of the following: a) knowingly make or cause to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized; b) knowingly conceal or fail to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized; c) knowingly make, or cause to be made…a false statement or misrepresentation of material fact concerning: 1) the conditions or operation of a facility in order that the facility may qualify for certification or recertification required by the Medicaid program, including certification or recertification as a nursing facility or skilled nursing facility or 2) information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program; d) knowingly make or cause to be made a claim under the Medicaid program for…a service or product that is substantially inadequate or inappropriate when compared to generally recognized standards within the particular discipline or within the health care industry; e) knowingly make, use, or cause the making or use of a false record or statement material to an obligation to pay or transmit money or property to [Texas] under the Medicaid program, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to [Texas] under the Medicaid program; f) except as authorized under the Medicaid program, knowingly pay, solicit, accept, or receive, in addition to an amount paid under the Medicaid program, a gift, money, a donation, or other consideration as a condition to the provision of a service or product or the continued provision of a service or product if the cost of the service or product is paid for, in whole or in part, under the

17

Medicaid program; or g) conspire to do any of the above. Tex. Hum. Res. Code § 36.002 *et seq.*

45. The TMFPA provides that a person acts "knowingly" if that person has knowledge of the information, acts with conscious indifference to the truth or falsity of the information, or acts in reckless disregard of the truth or falsity of the information. Tex. Hum. Res. Code § 36.0011. Notably, the TMFPA explicitly provides that "[p]roof of the person's specific intent to commit an unlawful act [] is not required in a civil or administrative proceeding to show that a person acted 'knowingly' with respect to information. . ." Tex. Hum. Res. Code § 36.0011.

### C. NEVADA FALSE CLAIMS ACT

46. The Nevada False Claims Act ("NVFCA") makes it unlawful to knowingly present or cause to be presented a false or fraudulent claim for payment or approval, knowingly make or use, or cause to be made or used, a false record or statement that is material to a false or fraudulent claim, and to knowingly conceal or knowingly and improperly avoid or decrease an obligation to pay or transmit money. *See* N.R.S § 357.040(1). The NVFCA also provides that it is unlawful to conspire to commit any of the acts set forth above or throughout the remainder of the subsection. *Id.*

47. The NVFCA provides that a person acts "knowingly" if that person (1) has knowledge of the information; (2) acts in deliberate ignorance of whether the information is true or false; or (3) acts in reckless disregard of the truth or falsity of the information. *See* N.R.S § 357.040(3). Notably, the NVFCA explicitly provides that proof of the person's specific intent to commit an unlawful act is not required to show that a person acted knowingly." *See* N.R.S § 357.040(1) ("a person who, with or without specific intent to defraud, does any of the following listed acts is liable…").

### D.    CALIFORNIA FALSE CLAIMS ACT

48.    California False Claims Act ("CFCA") creates liability for and prohibits several variations of fraud on the government. *See* Cal. Gov't Code § 12650 *et seq*. The CFCA makes it unlawful to knowingly present or cause to be presented a false or fraudulent claim for payment or approval, knowingly make or use, or cause to be made or used, a false record or statement that is material to a false or fraudulent claim, and to knowingly conceal or knowingly and improperly avoid or decrease an obligation to pay or transmit money. *See* Cal. Gov't Code § 12651(a). The CFCA also provides that it is unlawful to conspire to commit any of the acts set forth above or throughout the remainder of the subsection. *Id.*

49.    The CFCA provides that a person acts "knowingly" if that person (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information. *See* Cal. Gov't Code § 12650(b)(3).

### E.    INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT

50.    Indiana False Claims and Whistleblower Protection Act ("IFCWPA") makes it unlawful to knowingly present or cause to be presented a false or fraudulent claim for payment or approval, knowingly make or use, or cause to be made or used, a false record or statement that is material to a false or fraudulent claim, and to knowingly conceal or knowingly and improperly avoid or decrease an obligation to pay or transmit money. Ind. Code 5-11-5.5-2. The IFCWPA also provides that it is unlawful to conspire to commit any of those acts. *Id.*

51.    The IFCWPA provides that a person acts "knowingly" if that person (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the

19

information; or (3) acts in reckless disregard of the truth or falsity of the information.  Ind. Code 5-11-5.5-1(4).

### F.   MARYLAND FALSE HEALTH CLAIMS ACT

52.   Maryland False Health Claims Act ("MFHCA") creates liability for and prohibits several variations of fraud on the government.  Md. Code Health – General § 2-601 *et seq*.  The MFHCA makes it unlawful to knowingly present or cause to be presented a false or fraudulent claim for payment or approval, knowingly make or use, or cause to be made or used, a false record or statement that is material to a false or fraudulent claim, and to knowingly conceal or knowingly and improperly avoid or decrease an obligation to pay or transmit money.  Md. Code Health– General § 2-602(a).  The MFHCA also provides that it is unlawful to conspire to commit any of the acts set forth above.  *Id.*

53.   The MFHCA provides that a person acts "knowingly" if that person (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information.  Md. Code Health – General § 2-601(f).

### G.   NEW MEXICO MEDICAID FALSE CLAIMS ACT and NEW MEXICO FRAUD AGAINST TAXPAYERS ACT

54.   New Mexico Medicaid False Claims Act ("NMMFCA") and New Mexico Fraud Against Taxpayers Act ("NMFATA") create liability for and prohibit several variations of fraud on the government.  N.M. Stat. § 27-14-1 *et seq* and N.M. Stat. § 44-9-1 *et seq*, respectively.  The NMMFCA and NMFATA make it unlawful to knowingly present or cause to be presented a false or fraudulent claim for payment or approval, knowingly make or use, or cause to be made or used, a false record or statement that is material to a false or fraudulent claim, and to knowingly conceal or knowingly and improperly avoid or decrease an obligation to pay or transmit money.  N.M. Stat.

§ 27-14-4 and N.M. Stat. § 44-9-3. The NMMFCA and NMFATA also provide that it is unlawful to conspire to commit any of the acts set forth above or throughout the remainder of the subsection. *Id.*

55.     The NMFATA provides that a person acts "knowingly" if that person (1) with actual knowledge of the truth or falsity of the information; (2) in deliberate ignorance of the truth or falsity of the information; or (3) in reckless disregard of the truth or falsity of the information. N.M. Stat. § 44-9-2(c).

**H.     THE MEDICARE AND MEDICAID PROGRAMS**

**1.     Background**

56.     Medicare is a federal health insurance program created by Congress in 1965 for the elderly and disabled. *See* 42 U.S.C. §§ 1395-1395hhh. It is the nation's largest health insurance program and covers nearly 40 million people. Medicare pays doctors, hospitals, pharmacies, and other providers and suppliers of medical goods and services according to government-established conditions and rates. *Id.* The Medicare program is comprised of several parts, of which two, Parts A and B, are relevant here.

57.     Medicare Part A is a prospective payment system of insurance that helps cover certain types of care provided by skilled nursing facilities ("SNFs"), within specified limits, including physical, occupational, and speech therapy, as well as other services provided on an in-patient basis. *See* 42 U.S.C. § 1395c; 42 CFR 409.20. Medicare Part A reimburses SNFs on a per patient, per diem basis.

58.     Medicare Part B pays providers retrospectively on a fee-for-service basis. Although the majority of services provided by SNFs are reimbursed under Medicare Part A, Medicare Part B does occasionally cover therapeutic services provided on an inpatient basis where the patient's Part A coverage has lapsed (typically because the patient has stayed at the SNF longer

than the 100 day limit on Part A coverage).  Medicare Part B also covers any therapeutic services that are provided on an out-patient, rather than an in-patient, basis.

59.     Medicaid programs are administered by the various States, and are jointly financed by the federal and State governments.  The federal government pays its share of medical assistance expenditures to the State on a quarterly basis according to statements of expenditures submitted by the State and a formula described in sections 1903 and 1905(b) of the Medicaid Act.  The State pays its share of medical assistance expenditures from state and local government funds in accordance with section 1902(a)(2) of the Medicaid Act.

### 2.     Reimbursement

60.     Claims for services provided in SNFs are submitted to Medicare on Claim Form 1450 or its electronic equivalent, 837I.  At the end of its annual cost reporting period, the SNF must submit cost reports detailing the expenses and revenues for its facility along with the patient activity.  The SNF is required to accurately report its actual payments to suppliers, including suppliers and skilled therapy providers.

61.     The annual cost report is the final claim for payment and is submitted on CMS Form 2540-10 (unless the facility qualifies for a simplified cost report on Form 2540s).  Annual cost reports constitute the final accounting of the facility's federal program reimbursement.  The United States relies upon the annual cost report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare, Medicaid or other government programs.

62.     In order to receive payment, the SNF must certify that all data in its annual cost report is accurately and truthfully reported and that it has complied with all applicable laws and regulations.  The cost report requires the SNF employee or agent submitting the report to certify that he or she has read a statement which provides in relevant part:

22

> I have examined the accompanying electronically filed or manually submitted cost report and the balance sheet and statement of revenue and expenses ... and that to the best of my knowledge and belief it is a true, correct, and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. *I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations*. (Emphasis added).

63.    Where a SNF is part of a chain, the chain's headquarters must likewise submit an annual cost report. That submission similarly requires an officer to certify his or her understanding that: "If services identified in this cost report were provided or procured through the payment directly or indirectly of a kickback or were otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result."

64.    Defendants' scheme is multi-faceted and has thus violated numerous reimbursement rules promulgated by CMS. The relevant rules that each part of the scheme implicates are set forth below with greater specificity as relevant to each scheme. However, generally speaking, Medicare and Medicaid will pay *only* for medical treatment that is: a) medically reasonable and necessary; b) actually provided; and c) provided in compliance with other relevant laws and regulations. Various aspects of Fundamental's scheme have run afoul of each of these broad concepts.

## DEFENDANTS' FRAUDULENT CONDUCT

65.    Fundamental defrauds the Government by submitting claims for excess and undue reimbursement from Medicare/Medicaid. Among other things, Fundamental: 1) inappropriately admits patients or retains them longer than medically necessary to their detriment and discomfort, causing false claims to be submitted for unnecessary care; 2) misrepresents the resource utilization group ("RUG") scores of its patient population by artificially inflating the reported activities of daily living ("ADL") scores upon which RUG scores are based, thereby submitting for more

reimbursement than it is rightfully owed; 3) fraudulently bills group therapy as individual therapy sessions in order to maximize reimbursement; and 4) employs a widespread practice of reusing disposable equipment and engages in practices of understaffing in order to save on costs, in violation of the Nursing Home Reform Act.

66. In addition to, and in furtherance of the aforementioned fraud perpetrated upon the Government, Fundamental systematically retaliates against employees who oppose these practices, up to and including terminating those employees who refuse to participate in the fraud. Fundamental has engaged in such retaliatory actions against, among others, the Relator in this action.

**A. FUNDAMENTAL INAPPROPRIATELY ADMITS PATIENTS WHO DO NOT REQUIRE SKILLED NURSING OR REHABILITATION, OR WHO REQUIRE SERVICES FUNDAMENTAL CANNOT PROVIDE**

67. Medicare covers in-patient services provided at a SNF only where certain conditions are met. Specifically, a beneficiary must require skilled nursing or skilled rehabilitation services for a condition which either arose during, or was itself the cause of, a medically necessary hospital in-stay of at least three days, with the last day occurring within 30 days of the beneficiary's admission to the SNF. *See generally* 42 C.F.R. § 409.30, 409.31.

68. Further, the skilled nursing or rehabilitation services must be required "on a daily basis" and "be ones that, as a practical matter, can only be provided in a SNF, on an in-patient basis." 42 C.F.R. § 409.31(b). CMS defines "skilled nursing or rehabilitation services" as services "that are ordered by a physician and require the skills of technical or professional personnel such as registered nurses, licensed practical (vocational) nurses, physical therapists, occupational therapists, and speech pathologists or audiologists." 42 C.F.R. § 409.31(a).

69. Despite these clear requirements, Fundamental personnel are pressured, at risk of loss of employment, to inappropriately admit patients who clearly do not require skilled nursing

24

or rehabilitation services on a daily basis (or, in many cases, at all). These orders came from the Administrators at Fundamental's various facilities, and their uniformity compels the conclusion that this practice originated and emanated from Fundamental's central headquarters.

70. CW1 has been a Licensed Practical Nurse since 2005, and was a Nurse Supervisor at Fundamental's Magnolia Manor of Greenville, in Greenville, South Carolina from September 2009 until October of 2012, and was a nurse at Magnolia Place of Greenville from October 2013 until 2015. At both locations, CW1 witnessed the admission of numerous patients who did not meet CMS criteria for admission.

71. In one notably egregious example, CW1 cited the example of a patient who was frequently off-premises. This patient often left the premises in the morning and returned shortly before midnight – just in time to be counted as part of the nightly census. Obviously, if the patient was not on the premises whatsoever, she was not receiving either skilled nursing services or rehabilitation.

72. Unsurprisingly, the aforesaid patient was fully functional and capable of such tasks as using the bathroom by herself, yet Fundamental staff was instructed to "help" her with her undergarments during toileting. At one point, the patient was bluntly informed that the staff had to "help" her in order to keep her on the census and collect her Medicare payments. Overall, CW1 estimates that at any given time, roughly 50% of the census at the two locations where she worked was inappropriate.

73. CW2 was a Certified Nursing Assistant at Chesterfield Convalescent Center in Cheraw, South Carolina from August of 2013 until October of 2014. CW2 described a similar course of conduct. In particular, CW2 noted that many of the patients on census at the Chesterfield

location needed very little or no assistance, and could have easily stayed in their own homes with a home health aide coming by once or twice a week.

74.     CW3 has been a Licensed Vocational Nurse for approximately 20 years.  CW3 was employed as a charge nurse at Corinth Rehabilitation Suites in Corinth, Texas from March until October of 2014.  CW3 estimates that of Corinth's 80 patients on census during CW3's tenure, approximately 10% had been inappropriately admitted.

75.     CW4 has a background in Medicaid billing, and was a Business Office Manager at Corinth from April until September of 2013.  Although CW4 was only there for a brief period, CW4 described Corinth's Administrator, as well as that Administrator's superiors at corporate, as pushy.  CW4 further explained that on numerous instances, CW4 had warned the Administrator that various patients were inappropriate for admission and would likely not be reimbursed by Medicare, but CW4 was routinely overridden by the Administrator and/or the Administrator's superiors.

76.     CW5 has been a Licensed Practical Nurse for 26 years.  CW5 was employed at Magnolia Manor in Spartanburg, SC from October of 2015 until June of 2016.  According to CW5, the Spartanburg location employed excessively lax admissions standards, often failing to meet Medicare standards.

77.     CW6 was a Certified Nursing Assistant at two different Fundamental locations: one in Columbia, South Carolina in 2011, and another at Greenwood, South Carolina in 2013.  CW6 estimated that around 15% of the patients CW6 saw could easily have been attended to by home care, and did not require skilled nursing services.

78.     Similar to admitting patients who do not need its services, Fundamental also instructs its personnel to admit patients who need services Fundamental plainly cannot provide.

For example, before her illegal retaliatory discharge from Fundamental, Relator was a Director of Nursing ("DON") at Bridgecrest, a Fundamental facility located in Houston, Texas. In that capacity, she denied admission to a psychiatric patient on the grounds that the facility is not equipped to treat psychiatric patients. Nonetheless, once Relator was away on vacation, the facility administrator, Cameron Stiles, ordered the remaining intake nurse to admit the psychiatric patient, stating that "we have the 100 days of Medicare coverage." Upon returning from vacation, Relator learned that her fears had been realized – the psychiatric patient had assaulted other patients.

79.    CW7 was a Licensed Vocational Nurse for six years until becoming a Registered Nurse in July of 2016. CW7 worked at Bridgecrest from August 2015 until at least October of 2016. CW7 confirmed there were many inappropriately admitted patients at Bridgecrest, including psychiatric patients like the one described above. CW7 confirmed that there was Bridgecrest staff assigned to make preliminary evaluations regarding possible new admissions, but that when those staff members declined to admit a patient, they were frequently overruled.

80.    CW7 also stated that the patient described in paragraphs 78 and 112-113 was not the only psychiatric patient at Bridgecrest, but was one of perhaps 7 or 8 – which CW7 emphasized is extremely inappropriate, as the Bridgecrest facility was not equipped to handle such patients. CW7 further explained that Bridgecrest is equipped to deal with patients who have dementia, but that those who have psychiatric disorders can be violent, and require additional training and equipment that Bridgecrest does not have.

**B.    FUNDAMENTAL INAPPROPRIATELY KEEPS PATIENTS WELL AFTER THEY SHOULD HAVE BEEN DISCHARGED, IN ORDER TO BILL MEDICARE MORE**

81.    In addition to mandating that patients initially be eligible for stay at a SNF, CMS also requires periodic re-evaluations of patients during their 100 day stay in order to ensure that they continue to require SNF services. *See generally* 42 U.S.C. § 1395f(a)(2)(B); Medicare

General Information, Eligibility, and Entitlement Manual, Ch. 4, § 40.3. Fundamental has falsified these evaluations in an effort to keep patients for longer periods than are medically necessary.

82.     CW7 described this practice at the Bridgecrest location, explaining that as many as 50%-60% of patients who initially come in for short term care are often kept for long term care that, in CW7's view, is unwarranted. CW7 continued that Medicare Part A patients that are expected to stay about 20 days frequently end up staying an extra few weeks, or even indefinitely.

83.     CW8, a former administrator at two Fundamental facilities, Iowa Park Healthcare and Villa Haven in Breckenridge, Texas, confirmed that Fundamental continued therapy as long as possible – sometimes long after patients stopped benefitting – in order to claim the full 100 days of Medicare coverage. Moreover, Fundamental's corporate headquarters pressured its employees to engage in these practices, and would encourage patients to stay by, among other things, offering to waive co-pays in order to keep patients at the facility.

84.     CW1, in addition to reporting that as many as 50% of the patients at both Magnolia Place of Greenville and Magnolia Manor were improperly admitted, added that there were efforts taken to keep patients as long as possible, and further opined that the care administered was often very poor.

85.     CW9, a former LPN also at Magnolia Manor of Greenville in South Carolina, similarly stated that at that location, Fundamental engaged in a practice of unduly retaining Medicare patients, even to their detriment or discomfort. In one instance, a patient wished to be discharged from the facility, yet because he still had days of Medicare coverage remaining, the facility transferred him to another Fundamental-owned facility. Conversely, CW9 noted that, while Magnolia Manor wanted to keep Medicare patients, it also took efforts to discharge patients once Medicare coverage ran out and the less lucrative Medicaid coverage began.

28

86.     Fundamental's practice of maximizing patient stays is not only fraudulent, it is detrimental to patients.  In some instances, Fundamental has retained patients who plainly should have been enrolled in hospice care.  CW10, a former CNA and staffing coordinator at Magnolia Manor in Inman, South Carolina, described this practice at that location.  CW10 related that, some potential hospice patients were put through 2 or 3 sessions of PT, OT, and speech therapy per day – a needlessly grueling regimen, which Fundamental inflicted on people who derived no benefit.  Moreover, CW10 held that, at one time Magnolia carried at least 13 inappropriately admitted psychiatric patients solely to inflate its census.

87.     Similarly, CW11 is a former LPN at College Park Rehabilitation Center in Las Vegas, Nevada.  CW11's father, who was a patient at the facility, took a severe fall and should have been hospitalized.  Instead, Fundamental kept him for three days after his fall, in order to receive payment from Medicare.  Shortly thereafter, he had a seizure and died.  On another occasion, CW11was instructed by the Director of Nursing to inappropriately alter a patient's injury documentation.  In that case, a woman fell and had a bruise and bump on her forehead.  CW11 reported that the patient should be hospitalized, but was then instructed to alter the records in order to keep the patient at the facility.

88.     CW12, a former nurse at Magnolia Manor of Spartanburg, South Carolina, verified that many patients exhausted their Medicare coverage.  Similarly, CW6, a former CNA at two Fundamental facilities, Columbia and Greenwood, both in South Carolina, conveyed that Fundamental would often try to convince patients that desired to be discharged to instead stay at the facility.  Another nurse, CW13, formerly of Heritage Manor and Canton Oaks in Texas, further attested to Fundamental's practice of retaining patients until the 100 days of Medicare coverage was exhausted, and described this behavior as part of Fundamental's core practices.

29

## C. FUNDAMENTAL FALSIFIES ITS MDS REPORTS IN ORDER TO MAXIMIZE ITS PAYMENTS FROM MEDICARE

89. In addition to inappropriately retaining patients to maximize the number of days for which it is reimbursed for each patient, Fundamental also fraudulently inflates the amount it is paid for each day, by artificially inflating patients' RUG scores. Fundamental achieves this by embellishing the amount of patient therapy needed and/or by altering patient ADL scores.

90. The daily reimbursement received by a SNF for the care of each patient is based upon that patient's Resource Utilization Group ("RUG") score. The RUG score is used by CMS as an indicator of how much time and money a SNF will likely need to expend to properly care for each patient – the higher the score, the more money Medicare pays the SNF by way of reimbursement. *See generally* 42 C.F.R. §§ 413.335, 413.337.

91. RUG Scores, in turn, are based upon several factors that are contained in what is known as a "Minimum Data Set" ("MDS"). MDSes are filled out when a patient is first admitted to a SNF, and periodically afterwards. At Fundamental facilities, MDSes are completed by employees known as "MDS Coordinators." The information contained in the MDS includes the two factors that determine the patient's RUG category: 1) a report of the patient's therapy needs; and 2) the patient's "Activities of Daily Living" ("ADL") score.

92. The first category is straightforward – the MDS reports the number of minutes of therapy that has been provided to the patient during the relevant period, and the number of therapy disciplines (speech therapy, physical therapy, occupational therapy, and so forth) provided.

93. As to the second category, broadly speaking, ADL scores quantify the patient's need for assistance in day to day living – items such as whether the patient needs assistance using the toilet, assistance eating, assistance dressing, and so forth are all encompassed within a patient's ADL score.

30

94.     Taken together, the therapy minutes and the ADL score are used to calculate the patient's RUG category. *See generally* CMS's RAI Version 3.0 Manual, ch. 6; Medicare Program Integrity Manual, ch. 6.

95.     The highest-paying rehabilitation RUG category is denoted by "RU," which means "Rehabilitation Ultra High." To qualify for that category, a patient must receive at least 720 minutes of therapy in two or more disciplines, as measured over a seven-day assessment (or "look-back") period, with the patient receiving therapy in at least one therapy discipline on five of those seven days. This category is reserved for the minority of patients who are physically capable of and can benefit from such an intensive therapy schedule (nearly two-and-a-half hours daily for five days a week). Indeed, this level is "intended to apply only to the most complex cases requiring rehabilitative therapy well above the average amount of service time." 63 Fed. Reg. 25,252 at 26,258 (May 12, 1998).

96.     The difference in reimbursement levels between the various RUG categories is significant. Medicare Part A only pays for SNF care if the patient is "correctly assigned" to a RUG level. 42 C.F.R. § 424.20. Medicare also requires the facility to conduct an "accurate ... assessment of each resident's functional capacity." 42 C.F.R. § 483.20.

97.     Fundamental has sought to maximize its reimbursement by fraudulently inflating both the number of minutes of therapy provided and the ADL scores of the relevant patients. For example, CW1, a Nurse Supervisor at two of Fundamental's locations, reported that ADL scores were inflated at those locations, and also that Fundamental billed for therapy services it had not provided.

98.     As to the ADL scores, CW1 conveyed that employees were required to inflate or fabricate ADL scores. For example, even if a patient was capable of using the bathroom alone, a

Fundamental employee would nevertheless help them, then record that they provided assistance. This behavior was described by CW1 as mandatory for Fundamental employees. CW1 understood that failure to engage in such practices would have put her job at risk. CW7 and CW8 also recounted that at each of their respective facilities virtually all patients were at ultra-high RUG levels.

99.    Fundamental's disregard for the accuracy of MDSes is highlighted by such inappropriate practices as assigning a now unlicensed nurse trainer, Christopher Walton, to train a former co-worker of Relator's, CW7, as an MDS Coordinator. Walton has worked at various Fundamental facilities, including Bridgecrest, Estrella Oaks Rehabilitation & Care, and The Courtyards at Pasadena, where it is believed that he still works. Despite the revocation of his license, Walton performs MDS assessments, but signs under the DON's license. Walton's conduct is widely known and permitted by members of management, including Melanie Henry, Fundamental's Regional VP, along with Cameron Stiles, the Facility Administrator at Bridgecrest.

**D.    FUNDAMENTAL FRAUDULENTLY BILLS GROUP THERAPY AS INDIVIDUAL THERAPY SESSION IN ORDER TO MAXIMIZE REIMBURSEMENT**

100.    As another ploy to extract the highest possible reimbursement rates from the Government, Fundamental also bills group therapy sessions as individual sessions. By billing group therapy as individual sessions, Fundamental can fraudulently bill for several multiples of the amount of hours that it could bill for if its employees were truly performing individual therapy.

101.    To be eligible to collect Medicare or Medicaid payments, a provider must enroll with those programs by submitting a Form CMS-855B application and supporting documentation

32

to Medicare.[1]  Among other things, that form provides "additional requirements that [] provider[s] must meet and maintain in order to bill the Medicare program."  These requirements, which are prerequisites to payment under Medicare, include a certification that: "I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider . . . I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the providers' compliance with all applicable conditions of participation in Medicare."  CMS-855A, at 48.  The provider also certifies that "I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."  *Id.*

102.    Similarly, Medicaid regulations require that all provider claim forms include the following statements near the provider's signature: "This is to certify that the foregoing information is true, accurate, and complete.  I understand that payment of this claim will be from Federal and State funds, and that any falsification, or concealment of a material fact, may be prosecuted under Federal and State laws."  42 CFR 455.18.

103.    Claims for payment submitted to the Government in knowing violation of any material rules or requirements constitute false claims for purposes of the FCA.  By the same token, certifications falsely attesting to compliance with such material requirements constitute false statements.  Additionally, any person knowingly assisting or participating in the violation of material requirements is liable under the conspiracy provisions of the FCA.

---

[1]  Form CMS-855A is accessible at https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/downloads/cms855a.pdf (last accessed April 20, 2017).

104. Accordingly, billing group therapy sessions as individual sessions in order to bill for more total hours of reimbursement is clearly in violation of the FCA. CW8 verified that this practice occurred regularly at the Breckenridge facility.

### E. FUNDAMENTAL VIOLATES THE NURSING HOME REFORM ACT

105. In addition to falsifying the need for, and amount of, services rendered, Fundamental has also misrepresented the quality of those services. Specifically, Fundamental routinely seeks to cut costs at the expense of quality of patient care. Such practices include routinely understaffing its facilities, reusing disposable medical equipment, and generally providing poor patient care. Each of these practices are in violation of the Nursing Home Reform Act ("NHRA"). This, in turn, has rendered Fundamental's claims for payment false for purposes of the False Claims Act.

106. The NHRA mandates that nursing facilities comply with federal and state requirements relating to the provision of services, and with professional standards and principles applicable to nursing facilities. *See* 42 U.S.C. § 1396r(b); 42 U.S.C. § 1396r(d)(4)(A). Federal regulations mandate that "[e]ach resident must receive and the facility must provide the necessary care and services to attain or maintain the highest practicable physical, mental, and psychosocial well-being, in accordance with the comprehensive assessment [of the resident] and plan of care." *See* 42 C.F.R. § 483.25.

107. Moreover, compliance with the NHRA is required in order for Fundamental to participate in and receive payments under the Medicare and Medicaid programs. Under these programs, a nursing home must execute a Health Insurance Benefit Agreement, Form CMS-1561. *See* 42 U.S.C. § 1395cc. By doing so, a provider expressly agrees to conform with the applicable Code of Federal Regulations within Title 42, including the standard of care regulations that implement the NHRA, 42 U.S.C. §§ 1395i-3, 1396r *et seq. See* 42 C.F.R. § 483. The NHRA

explicitly states that violations of its provisions can be material to the United States' decision to pay a nursing facility, and expressly permits the denial of payment for such violations. *See* 42 U.S.C. § 1395i-3(h)(2)(B)(I).

108. Nevertheless, Fundamental employees are routinely instructed to provide substandard care in order to lower expenses. For example, CW1 was instructed to reuse disposable instruments, including by soaking trachea tubes in peroxide so they could be reused – a dangerously unsanitary practice. CW1 also witnessed instances in which patients Fundamental facilities did not even provide bedsheets to patients, instead requiring them to lie on unadorned plastic mattresses.

109. Similarly, CW9 was instructed to use alcohol swabs to "clean" disposable equipment so that it could be reused rather than discarded. CW9 was also instructed to change the dates on the equipment to prevent the facility from being fined. Likewise, CW10 witnessed the reuse of both colostomy bags and disposable compression stockings.

110. In addition to inappropriate reuse of disposable medical equipment, Fundamental also illegally understaffs its facilities. CW9's former facility, Magnolia Manor of Greenville, violates South Carolina state law which requires at least one nurse and five CNA's to be on duty for every 44 patients. This law was violated regularly, especially during night shift. CW9 was given responsibility for 50 patients.

## F. FUNDAMENTAL RETALIATED AGAINST RELATOR

111. Fundamental either acts with disregard when employees make internal complaints about issues arising from Fundamental's violative practices, or threatens and even discharges its employees when they resist its illegal directives. The Anti-Retaliation provision of the FCA prohibits an employer from retaliating against an employee "because of lawful acts done by the

employee . . . in furtherance of…efforts to stop 1 or more violations of" the FCA.  31 U.S.C. §3730(h).

112.     As described in paragraph 78 and in greater detail here, Fundamental discharged Relator for her lawful actions taken in furtherance of this FCA action.  Relator, prior to leaving on a vacation, denied admission to a psychiatric patient – a referral from Bayshore Medical Center in Pasadena, Texas – for lack of skillable need.  Upon returning from vacation, Relator learned that Bridgecrest Facility Administrator Cameron Stiles ordered a remaining intake nurse to admit the psychiatric patient, even though he was aware that Relator had previously denied admission.  Relator also learned that that the psychiatric patient, who has a history of violence, had been assaulting other patients.

113.     In response, Relator expressed her disapproval to Mr. Stiles in front of several colleagues.  Mr. Stiles asked Relator to move the conversation to his office to be in private.  Once in his office, Relator once again explained why she had denied the psychiatric patient and told Mr. Stiles that she planned to escalate her complaint to the corporate office.  Mr. Stiles became angry and yelled to Relator: "get out of here!"  Later that day, Relator received a phone call from Fundamental's Regional VP, Melanie Henry, who told Relator that she was suspended "pending further investigation."  Within days, Bridgecrest Human Resources employee, Twylla Hisaw, called Relator to tell her that she had been terminated.

114.     In addition to Relator, several other witness were either ignored, threatened, or fired as a result of complaints or refusal to abide by Fundamental's illegal practices.  CW8 was fired by Fundamental after refusing to fraudulently change the available bed count, which Fundamental wanted him to do in order to avoid being required to pay back money owed to the Medicare and/or

36

Medicaid programs.  At the time, CW8 requested that Fundamental email their instructions, which Fundamental refused to do.

115.    Additionally, CW1 and other employees were concerned that Fundamental employed a practice of billing Medicare for services that were not being rendered.  In response, staff wrote anonymous letters of complaint to the corporate office, but to the best of CW1's knowledge, those letters were ignored – no internal investigation or audit was commenced, and the practices continued unabated.  CW1 resigned from Fundamental due to this conduct, as well as the threatening environment toward employees that spoke out against Fundamental's troubling practices.  CW1 explained that Fundamental retaliated against employees many times.  CW7 likewise resigned due to discomfort with the practice of the unlicensed MDS coordinator continuing to make MDS assessments, then signing under the DON's license.

### G.    ADDITIONAL ALLEGATIONS REGARDING SCOPE AND SCIENTER

116.    No stranger to litigation, Fundamental and its two primary shareholders, Murray Forman and Leonard Grunstein, have time and again attempted to avoid liability by virtue of Fundamental's corporate structure.[2]  Fundamental's efforts to disclaim liability for its behavior span everything from wrongful death suits to bankruptcy.  Its position, however, is starkly undermined by the facts.  *See generally* Exhibit B, Plaintiff's Brief in Opposition to Defendant Fundamental Long Term Care Holdings, LLC's Motion to Dismiss for Lack of Personal

---

[2] This is not the first time entities controlled by Messrs. Grunstein and Forman have attempted to defraud the United States.  *See generally United States ex rel. Resnick v. Omnicare, Inc., et al.,* No. 06-10149-RGS (D. Mass.).  Indeed, in one notable case, Messrs. Gruman and Forman took the position that they should not be held responsible for a $100 million loan, because the loan was never funded.  When presented with their own writings stating otherwise, they audaciously explained that those writings had been fabricated by them as part of an effort to defraud third party lenders, including the Department of Housing and Urban Development.  *See Schron v. Grunstein,* 2012 NY Slip Op 51730(U), ¶ 9 n.6, 36 Misc. 3d 1238(A), 1238A (Sup. Ct.).

Jurisdiction, *Hawthorne v. Fundamental Long Term Care Holdings, LLC et al*, 2:12-cv-01826 (W.D. Pa.).

117.    Although Fundamental has been careful to insure that each facility is ostensibly its own legal entity, the fraud alleged herein emanates from Fundamental's corporate headquarters and occurs, at Fundamental's direction, in all of its facilities.  Fundamental's control over the day-to-day operational decisions of each facility is evidenced by: a) its ownership interest and management of each facility; b) eyewitness accounts; and c) Fundamental's behavior in other litigation.

118.    Fundamental's ownership interest in the facility defendants has been discussed above at paragraphs 18 to 28, and need not be repeated here.  Fundamental does not act as a mere silent stakeholder, but rather exercises day-to-day control over the various facilities.  Specifically, Fundamental: a) hires the staff at each facility; b) directs the staff to engage in the fraud (and retaliates against those who do not); and c) purports to operate a compliance hot-line through which employees can raise concerns.

119.    As to the first point, Fundamental's control over the hiring of staff at each facility can be easily gleaned from its website, where it posts job openings.  *See* http://www.jobs.net/jobs/fundltc/en-us/all-jobs/ (last accessed May 6, 2017).[3]  As of the drafting of this Complaint, the jobs listed ran the gamut from hourly positions such as therapists and nurses, to management level positions such as Administrator, i.e. the person overseeing an entire facility.

---

[3] Although the URL of the website shows it is hosted at "jobs.net," which is owned by CareerBuilder LLC, the website is accessed from Fundamental's own website, Fundltc.com, by clicking the "Career Center" link.  Further, the "Privacy Policy" located on jobs.net states that "CareerBuilder, LLC [] provides the Talent Network *on behalf of the employer whose career and employment opportunities are promoted* on this Talent Network."  In other words, while jobs.net is apparently maintained by a third party, the jobs listed at http://www.jobs.net/jobs/fundltc/en-us/all-jobs/ are posted on behalf of Fundamental.

Notably, the positions Fundamental sought to fill as of the drafting of this Complaint included virtually every position that one would expect to participate in the fraud alleged herein, including: physical and occupational therapists at the various facilities; MDS Coordinators at the various facilities; Administrators at the various facilities; and reimbursement analysts at Fundamental's corporate headquarters in Sparks, MD.

120.    Similarly, Fundamental's own website lists a "Compliance Hotline" by which both patients and employees can report concerns regarding any of the facility defendants listed herein. *See* http://fundltc.com/Main/Intouch.aspx.   Moreover, employees at least at the facility where Relator worked have email addresses that end with "@fundltc.com," which is the same domain as Fundamental's website.

121.    Witnesses have further confirmed that Fundamental orchestrates the fraud alleged herein.  CW8, who was an Administrator at two different Fundamental facilities, confirmed that he was pressured by his direct supervisor, a Regional Manager, to engage in the fraud alleged herein.   That Regional Manager, in turn, received her orders from Fundamental's corporate headquarters in Maryland.

122.    CW8 also explained that Fundamental's headquarters in Maryland promulgated per-patient profitability guidelines to each Fundamental facility.  Specifically, CW8 recalled being told that his facilities were required to generate $500 per patient per day, which was to be attained by providing the various therapies discussed above.  Indeed, a review of the fee schedule applicable to CW8's location even using today's present rates (which are greater than those applicable during CW8's tenure), reveals that in order to attain $500 per patient per day, Fundamental would have to have patients with RUG scores in roughly the most severe 10% of the patient population.

123.     Specifically, although there are eight categories of RUG scores, and approximately 65 individual scores across those eight categories, in order to receive $500 per day, a patient must fall into one of the most care-intensive three categories of RUG scores and, indeed, in one of the eight most severe overall scores possible.  Indeed, unless a patient has both a tracheotomy and requires a respirator or ventilator, there is no way to achieve Fundamental's stated goal of receiving $500 per day without providing therapy.

124.     CW8 also recalled being pressured by his supervisor to keep patients longer than necessary.  The pressure applied by Fundamental was more than mere cajoling.  CW8 explained that each facility's administrator would receive a monetary bonus for exceeding the monetary per-patient goals set forth by Fundamental, while failing to meet those goals resulted in reprimands.

125.     Documents filed by Fundamental in other litigation further show that Fundamental, as well as its two principal shareholders, Leonard Grunstein and Murray Forman, ultimately control each of the various facilities.  *See, e.g.,* Exhibit C, Affidavit of Murray Forman stating that Fundamental operates "98 facilities in 14 states, employs 10,000 persons, and cares for approximately 7,550 patients."  Similarly, Fundamental's own Operating Agreement claims that the "Company is in the business of managing and operating long-term care facilities, including skilled nursing facilities, long-term care hospitals, and assisted living facilities." *See, e.g.,* Exhibit D, Fundamental Long Term Care Holdings, LLC's Operating Agreement.

126.     Relator believes additional evidence for Fundamental's control over the various facility defendants will be secured through discovery, and will amend this Complaint accordingly at that time.

## COUNT I

### VIOLATIONS OF 31 U.S.C § 3729(a)(1)(A)

127. Relator, on behalf of the United States, re-alleges and incorporates by reference all preceding paragraphs of this Complaint.

128. The FCA makes it unlawful for any person to knowingly present a false or fraudulent claim for payment or approval. Defendants regularly submit cost reports detailing expenses and revenues for its facilities along with the patient activity. Such cost reports are required to accurately report actual payments to suppliers, including skilled therapy providers.

129. As alleged herein, many of these claims were knowingly false and fraudulent within the meaning of the FCA. Moreover, Defendants knowingly presented, and caused to be presented, to an officer and employee of the United States Government false and fraudulent claims for payment and approval in violation of 31 U.S.C. § 3729(a)(1)(A).

130. Defendants had actual knowledge of the falsity of these claims, or deliberately ignored or recklessly disregarded their truth or falsity, within the meaning of the FCA.

131. The United States suffered damages as a result of false claims by Defendants and is entitled to recover its losses and obtain other relief available under the FCA.

## COUNT II

### VIOLATIONS OF 31 U.S.C § 3729(a)(1)(B)

132. Relator re-alleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

133. The FCA makes it unlawful for any person to knowingly make or use a false record or statement that is material to a false or fraudulent claim. As set forth above, Defendants fraudulently admit patients who are not appropriate for admission, and in so doing inappropriately

41

manipulate patient records to falsely reflect that the patient is eligible and appropriate for Defendants' care.

134.    As alleged herein, many of these records and statements were knowingly false and fraudulent within the meaning of the FCA.  Moreover, Defendants knowingly made, used, and caused to be made and used, false records and statements to get false and fraudulent claims paid and approved by the United States Government in violation of 31 U.S.C. § 3729(a)(1)(B).

135.    Defendants had actual knowledge of the falsity of these statements, or deliberately ignored or recklessly disregarded their truth or falsity, within the meaning of the FCA.

136.    The United States suffered damages as a result of false records and statements by Defendants and is entitled to recover its losses and obtain other relief available under the FCA.

## COUNT III

### VIOLATIONS OF 31 U.S.C § 3729(a)(1)(C)

137.    Relator re-alleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

138.    By engaging in the misconduct alleged herein, Defendants conspired with one another to violate 31 U.S.C. § 3729(a)(1)(A), (B), and (G), in violation of 31 U.S.C. § 3729(a)(1)(C).

139.    Defendants knew it was unlawful to violate or cause another to violate the FCA and that it was unlawful to submit claims to Medicare for therapy services that were not reasonable or medically necessary.

140.    By virtue of Defendants conspiring to and violating the FCA, the United States has been damaged in a substantial amount to be determined at trial.

**COUNT IV**

**VIOLATIONS OF 31 U.S.C § 3729(a)(1)(G)**

141.    Relator re-alleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

142.    The FCA makes it unlawful for any person to knowingly make or use a false record or statement that is material to an obligation to pay or transmit money or property to the United States Government through Medicare ("Reverse False Claim").  Defendants regularly violate the Reverse False Claim provision by creating and submitting false records or statements based upon the reuse of disposable medical equipment and illegal understaffing its facilities.

143.    For the reasons alleged herein, these records and statements were knowingly false and fraudulent within the meaning of the FCA.  Moreover, Defendants knowingly made, used, and caused to be made and used, these records and statements to get false and fraudulent claims paid and approved by the United States Government and/or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government, all in violation of 31 U.S.C. § 3729(a)(1)(G).

144.    The United States suffered damages as a result of Defendants' false records and statements and knowingly avoided or decreased obligations and is entitled to recover its losses and obtain other relief available under the FCA.

**COUNT V**

**VIOLATIONS OF 31 U.S.C § 3730(h)**

145.    Relator re-alleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

146.    Defendants retaliated against the Relator for refusing to engage in Fundamental's fraudulent scheme and reporting it to her superiors, as described herein.  Relator was discharged

43

from her employment, also as a result of her lawful acts done in furtherance of this action, as set forth above. This discharge was in violation of 31 U.S.C. § 3730(h).

147. As a direct and proximate result of this unlawful and discriminatory discharge, Relator has suffered emotional pain and mental anguish, together with serious economic hardship, including lost wages and special damages associated with her efforts to obtain alternative employment, in an amount to be proven at trial.

## COUNT VI

### CALIFORNIA FALSE CLAIMS ACT, CAL. GOV'T CODE § 12651(a)(1)

148. Relator re-alleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

149. This is a claim for treble damages and penalties under the California False Claims Act, Cal. Gov't Code § 12650 *et seq.*

150. Fundamental and the California Facilities violated Cal. Gov't Code § 12651(a)(1), which makes it unlawful for any person to knowingly present a false or fraudulent claim for payment or approval. Defendants regularly submit cost reports detailing expenses and revenues for its facilities along with the patient activity. Such cost reports are required to accurately report actual payments to suppliers, including skilled therapy providers. The State of California, by and through the California Medicaid program and other state health care programs, and while unaware of Fundamental and the California Facilities' fraudulent and illegal practices, paid the claims submitted in connection therewith.

151. Compliance with applicable federal and state laws and regulations cited herein is a material condition of payment of claims submitted to the State of California.

44

152.    Had the State of California known that Fundamental and the California Facilities were violating the federal and state laws and regulations cited herein, it would not have paid the claims caused to be submitted by Fundamental and the California Facilities' fraudulent and illegal practices.

153.    As a result of Fundamental and the California Facilities' violations of Cal. Gov't Code § 12651(a)(1), the State of California has been damaged in a significant amount to be determined at trial.

154.    This Court is requested to accept supplemental jurisdiction over this related state claim as it is predicated upon the same facts as the federal claim, and asserts separate damages to the State of California in the operation of its Medicaid and other state health care programs.

## COUNT VII

### CALIFORNIA FALSE CLAIMS ACT, CAL. GOV'T CODE § 12651(a)(2)

155.    Relator re-alleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

156.    This is a claim for treble damages and penalties under the California False Claims Act, Cal. Gov't Code § 12650 *et seq*.

157.    Fundamental and the California Facilities violated Cal. Gov't Code § 12651(a)(2), which makes it unlawful for any person to knowingly make or use a false record or statement that is material to a false or fraudulent claim.  As set forth above, Defendants fraudulently admit patients who are not appropriate for admission, and in so doing inappropriately manipulate patient records to falsely reflect that the patient is eligible and appropriate for Defendants' care. The State of California, by and through the California Medicaid program and other state health care

programs, and while unaware of Fundamental and the California Facilities' fraudulent and illegal practices, paid the claims submitted in connection therewith.

158.    Compliance with applicable federal and state laws and regulations cited herein is a material condition of payment of claims submitted to the State of California.

159.    Had the State of California known that Fundamental and the California Facilities were violating the federal and state laws and regulations cited herein, it would not have paid the claims caused to be submitted by Fundamental and the California Facilities' fraudulent and illegal practices.

160.    As a result of Fundamental and the California Facilities' violations of Cal. Gov't Code § 12651(a)(2), the State of California has been damaged in a significant amount to be determined at trial.

161.    This Court is requested to accept supplemental jurisdiction over this related state claim as it is predicated upon the same facts as the federal claim, and asserts separate damages to the State of California in the operation of its Medicaid and other state health care programs.

## COUNT VIII

### CALIFORNIA FALSE CLAIMS ACT, CAL. GOV'T CODE § 12651(a)(3)

162.    Relator re-alleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

163.    This is a claim for treble damages and penalties under the California False Claims Act, Cal. Gov't Code § 12650 *et seq.*

164.    By engaging in the misconduct alleged herein, Fundamental and the California Facilities conspired with one another to violate Cal. Gov't Code § 12651(a)(1) and (2), in violation of Cal. Gov't Code § 12651(a)(3).

165.    Compliance with applicable federal and state laws and regulations cited herein is a material condition of payment of claims submitted to the State of California.

166.    Fundamental and the California Facilities knew it was unlawful to violate or cause another to violate the California False Claims Act and that it was unlawful to submit claims to Medicaid and other state health care programs for therapy services that were not reasonable or medically necessary.

167.    As a result of Fundamental and the California Facilities' violations of Cal. Gov't Code § 12651(a)(3), the State of California has been damaged in a significant amount to be determined at trial.

168.    This Court is requested to accept supplemental jurisdiction over this related state claim as it is predicated upon the same facts as the federal claim, and asserts separate damages to the State of California in the operation of its Medicaid and other state health care programs.

## COUNT IX

### VIOLATIONS OF NEVADA FALSE CLAIMS ACT, NEV. REV. STAT. § 357.040(1)(a)

169.    Relator re-alleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

170.    This is a claim for treble damages and penalties under the Nevada False Claims Act, Nev. Rev. Stat. § 357.010 *et seq.*

171.    Fundamental and the Nevada Facilities violated Nev. Rev. Stat. § 357.040(1)(a), which makes it unlawful for any person to knowingly present a false or fraudulent claim for payment or approval.  Defendants regularly submit cost reports detailing expenses and revenues for its facilities along with the patient activity.  Such cost reports are required to accurately report actual payments to suppliers, including skilled therapy providers.  The State of Nevada, by and

through the State of Nevada's Medicare program, Medicaid program, and other health care programs, and while unaware of Fundamental and the Nevada Facilities' fraudulent and illegal practices, paid the claims submitted in connection therewith.

172. Compliance with applicable federal and state laws and regulations cited herein is a material condition of payment of claims submitted to the State of Nevada.

173. Had the State of Nevada known that Fundamental and the Nevada Facilities were violating the federal and state laws cited herein, it would not have paid the claims that Fundamental and the Nevada Facilities' fraudulent and illegal practices caused to be submitted.

174. As a result of Fundamental and the Nevada Facilities' violations of Nev. Rev. Stat. § 357.040(1)(a), the State of Nevada has been damaged in a significant amount to be determined at trial.

175. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the same facts as the federal claim, and asserts separate damage to the State of Nevada in the operation of its Medicare Program, Medicaid program, and other state health care programs.

## COUNT X

### VIOLATIONS OF NEVADA FALSE CLAIMS ACT, NEV. REV. STAT. § 357.040(1)(b)

176. Relator re-alleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

177. This is a claim for treble damages and penalties under the Nevada False Claims Act, Nev. Rev. Stat. § 357.010 *et seq.*

178. Fundamental and the Nevada Facilities violated Nev. Rev. Stat. § 357.040(1)(b), which makes it unlawful for any person to knowingly make or use, or causes to be made or used,

a false record or statement that is material to a false or fraudulent claim. As set forth above, Defendants fraudulently admit patients who are not appropriate for admission, and in so doing inappropriately manipulate patient records to falsely reflect that the patient is eligible and appropriate for Defendants' care. The State of Nevada, by and through the State of Nevada's Medicare program, Medicaid program, and other health care programs, and while unaware of Fundamental and the Nevada Facilities' fraudulent and illegal practices, paid the claims submitted in connection therewith.

179.    Compliance with applicable federal and state laws and regulations cited herein is a material condition of payment of claims submitted to the State of Nevada.

180.    Had the State of Nevada known that Fundamental and the Nevada Facilities were violating the federal and state laws cited herein, it would not have paid the claims that Fundamental and the Nevada Facilities' fraudulent and illegal practices caused to be submitted.

181.    As a result of Fundamental and the Nevada Facilities' violations of Nev. Rev. Stat. § 357.040(1)(b), the State of Nevada has been damaged in a significant amount to be determined at trial.

182.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the same facts as the federal claim, and asserts separate damage to the State of Nevada in the operation of its Medicare Program, Medicaid program, and other state health care programs.

**COUNT XI**

**VIOLATIONS OF NEVADA FALSE CLAIMS ACT,
NEV. REV. STAT. § 357.040(1)(i)**

183.    Relator re-alleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

184. This is a claim for treble damages and penalties under the Nevada False Claims Act, Nev. Rev. Stat. § 357.010 *et seq.*

185. By engaging in the misconduct alleged herein, Fundamental and the Nevada Facilities conspired with one another to violate Nev. Rev. Stat. § 357.040(1)(a) and (b), in violation Nev. Rev. Stat. § 357.040(1)(i).

186. Compliance with applicable federal and state laws and regulations cited herein is a material condition of payment of claims submitted to the State of Nevada.

187. Fundamental and the Nevada Facilities knew it was unlawful to violate or cause another to violate the Nevada False Claims Act and that it was unlawful to submit claims to the Medicare program, Medicaid program, and other state health care programs for therapy services that were not reasonable or medically necessary.

188. As a result of Fundamental and the Nevada Facilities' violations of Nev. Rev. Stat. § 357.040(1)(i), the State of Nevada has been damaged in a significant amount to be determined at trial.

189. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the same facts as the federal claim, and asserts separate damage to the State of Nevada in the operation of its Medicare Program, Medicaid program, and other state health care programs.

**COUNT XII**

**VIOLATIONS OF TEXAS MEDICAID FRAUD PREVENTION LAW, TEX. HUM. RES. CODE § 36.002(1)**

190. Relator re-alleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

191.   This is a claim for two times the amount of the payment or the value of the benefit described by Tex. Hum. Res. Code § 36.052(a)(1), in addition to all applicable civil penalties and prejudgment interest.

192.   Fundamental and the Texas Facilities violated Tex. Hum. Res. Code § 36.002(1), which makes it unlawful for any person to knowingly make or cause to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized.   Defendants regularly submit cost reports detailing expenses and revenues for its facilities along with the patient activity.   Such cost reports are required to accurately report actual payments to suppliers, including skilled therapy providers.   The State of Texas, by and through the State of Texas's Medicaid program, and while unaware of Fundamental and the Texas Facilities' fraudulent and illegal practices, paid the claims submitted in connection therewith.

193.   Compliance with applicable federal and state laws and regulations cited herein is a material condition of payment of claims submitted to the State of Texas.

194.   Had the State of Texas known that Fundamental and the Texas Facilities violated the federal and state laws cited herein, it would not have paid the claims that Fundamental and the Texas Facilities' fraudulent and illegal practices caused to be submitted.

195.   As a result of Fundamental and the Texas Facilities' violations of Tex. Hum. Res. Code § 36.002(1), the State of Texas has been damaged in a significant amount to be determined at trial.

196.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the same facts as the federal claim, and asserts separate damage to

51

the State of Texas in the operation of its Medicaid program.

## COUNT XIII

### VIOLATIONS OF TEXAS MEDICAID FRAUD PREVENTION LAW, TEX. HUM. RES. CODE § 36.002(2)

197. Relator re-alleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

198. This is a claim for two times the amount of the payment or the value of the benefit described by Tex. Hum. Res. Code § 36.052(a)(1), in addition to all applicable civil penalties and prejudgment interest.

199. Fundamental and the Texas Facilities violated Tex. Hum. Res. Code § 36.002(2), which makes it unlawful for any person to knowingly conceal or fail to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized. As set forth above, Defendants fraudulently admit patients who are not appropriate for admission, and in so doing inappropriately manipulate patient records to falsely reflect that the patient is eligible and appropriate for Defendants' care. The State of Texas, by and through the State of Texas's Medicaid program, and while unaware of Fundamental and the Texas Facilities' fraudulent and illegal practices, paid the claims submitted in connection therewith.

200. Compliance with applicable federal and state laws and regulations cited herein is a material condition of payment of claims submitted to the State of Texas.

201. Had the State of Texas known that Fundamental and the Texas Facilities violated the federal and state laws cited herein, it would not have paid the claims that Fundamental and the Texas Facilities' fraudulent and illegal practices caused to be submitted.

202. As a result of Fundamental and the Texas Facilities' violations of Tex. Hum. Res. Code § 36.002(2), the State of Texas has been damaged in a significant amount to be determined at trial.

203. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the same facts as the federal claim, and asserts separate damage to the State of Texas in the operation of its Medicaid program.

## COUNT XIV

### VIOLATIONS OF TEXAS MEDICAID FRAUD PREVENTION LAW, TEX. HUM. RES. CODE § 36.002(6)(A)

204. Relator re-alleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

205. This is a claim for two times the amount of the payment or the value of the benefit described by Tex. Hum. Res. Code § 36.052(a)(1), in addition to all applicable civil penalties and prejudgment interest.

206. Fundamental and Bridgecrest violated Tex. Hum. Res. Code § 36.002(6)(A), which makes it unlawful for any person to knowingly present or cause to be presented a claim for payment under the Medicaid program for a product provided or a service rendered by a person who is not licensed to provide the product or render the service, if a license is required. Bridgecrest permitted Cameron Stiles, an unlicensed nurse trainer and Bridgecrest Facility Administrator, to perform MDS assessments then sign under the Director of Nursing's license. Stiles' practice was known and permitted by Fundamental corporate, including Melanie Henry, Fundamental's Regional VP. The State of Texas, by and through the State of Texas's Medicaid program, and while unaware of Fundamental and the Texas Facilities' fraudulent and illegal practices, paid the claims submitted in connection therewith.

207.　Compliance with applicable federal and state laws and regulations cited herein is a material condition of payment of claims submitted to the State of Texas.

208.　Had the State of Texas known that Fundamental and the Texas Facilities violated the federal and state laws cited herein, it would not have paid the claims that Fundamental and the Texas Facilities' fraudulent and illegal practices caused to be submitted.

209.　As a result of Fundamental and the Texas Facilities' violations of Tex. Hum. Res. Code § 36.002(6)(A), the State of Texas has been damaged in a significant amount to be determined at trial.

210.　This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the same facts as the federal claim, and asserts separate damage to the State of Texas in the operation of its Medicaid program.

## COUNT XV

### VIOLATIONS OF TEXAS MEDICAID FRAUD PREVENTION LAW, TEX. HUM. RES. CODE § 36.002(7)(B)

211.　Relator re-alleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

212.　This is a claim for two times the amount of the payment or the value of the benefit described by Tex. Hum. Res. Code § 36.052(a)(1), in addition to all applicable civil penalties and prejudgment interest.

213.　Fundamental and the Texas Facilities violated Tex. Hum. Res. Code §36.002(7)(B), which makes it unlawful for any person to knowingly make or cause to be made a claim under the Medicaid program for a service or product that is substantially inadequate or inappropriate when compared to generally recognized standards within the particular discipline or within the health care industry.　Fundamental and the Texas Facilities, among other things, inappropriately admit

54

patients or retain them longer than medically necessary to their detriment and discomfort, causing false claims to be submitted for unnecessary care; misrepresent the RUG scores of its patient population by artificially inflating the reported ADL scores upon which RUG scores are based; fraudulently bill group therapy as individual therapy sessions in order to maximize reimbursement; and employ a widespread practice of reusing disposable equipment and engage in practices of understaffing in order to save on costs, in violation of the Nursing Home Reform Act. The State of Texas, by and through the State of Texas's Medicaid program, and while unaware of Fundamental and the Texas Facilities' fraudulent and illegal practices, paid the claims submitted in connection therewith.

214. Compliance with applicable federal and state laws and regulations cited herein is a material condition of payment of claims submitted to the State of Texas.

215. Had the State of Texas known that Fundamental and the Texas Facilities violated the federal and state laws cited herein, it would not have paid the claims that Fundamental and the Texas Facilities' fraudulent and illegal practices caused to be submitted.

216. As a result of Fundamental and the Texas Facilities' violations of Tex. Hum. Res. Code § 36.002(7)(B), the State of Texas has been damaged in a significant amount to be determined at trial.

217. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the same facts as the federal claim, and asserts separate damage to the State of Texas in the operation of its Medicaid program.

## COUNT XVI

### VIOLATIONS OF TEXAS MEDICAID FRAUD PREVENTION LAW, TEX. HUM. RES. CODE § 36.002(9)

218.    Relator re-alleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

219.    This is a claim for two times the amount of the payment or the value of the benefit described by Tex. Hum. Res. Code § 36.052(a)(1), in addition to all applicable civil penalties and prejudgment interest.

220.    By engaging in the misconduct alleged herein, Fundamental and the Texas Facilities conspired with one another to violate Tex. Hum. Res. Code § 36.002(1), (2), (6)(A), (7)(B), and (13), in violation of Tex. Hum. Res. Code § 36.002(9).

221.    Compliance with applicable federal and state laws and regulations cited herein is a material condition of payment of claims submitted to the State of Texas.

222.    Fundamental and the Texas Facilities knew it was unlawful to violate or cause another to violate the Texas Medicaid Fraud Prevention Law and that it was unlawful to submit claims to Medicaid and other state health care programs for therapy services that were not reasonable or medically necessary.

223.    As a result of Fundamental and the Texas Facilities' violations of Tex. Hum. Res. Code § 36.002(9), the State of Texas has been damaged in a significant amount to be determined at trial.

224.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the same facts as the federal claim, and asserts separate damage to the State of Texas in the operation of its Medicaid program.

## COUNT XVII

### VIOLATIONS OF TEXAS MEDICAID FRAUD PREVENTION LAW, TEX. HUM. RES. CODE § 36.002(13)

225.   Relator re-alleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

226.   This is a claim for two times the amount of the payment or the value of the benefit described by Tex. Hum. Res. Code § 36.052(a)(1), in addition to all applicable civil penalties and prejudgment interest.

227.   Fundamental and the Texas Facilities violated Tex. Hum. Res. Code § 36.002(13), which makes it unlawful for any person to knowingly engage in conduct that constitutes a violation under Tex. Hum. Res. Code § 32.039(b).  Fundamental and the Texas Facilities, among other things, inappropriately admit patients or retain them longer than medically necessary to their detriment and discomfort, causing false claims to be submitted for unnecessary care; misrepresent the RUG scores of its patient population by artificially inflating the reported ADL scores upon which RUG scores are based; fraudulently bill group therapy as individual therapy sessions in order to maximize reimbursement; and employ a widespread practice of reusing disposable equipment and engage in practices of understaffing in order to save on costs, in violation of the Nursing Home Reform Act.  The State of Texas, by and through the State of Texas's Medicaid program, and while unaware of Fundamental and the Texas Facilities' fraudulent and illegal practices, paid the claims submitted in connection therewith.

228.   Compliance with applicable federal and state laws and regulations cited herein is a material condition of payment of claims submitted to the State of Texas.

229. Had the State of Texas known that Fundamental and the Texas Facilities violated the federal and state laws cited herein, it would not have paid the claims that Fundamental and the Texas Facilities' fraudulent and illegal practices caused to be submitted.

230. As a result of Fundamental and the Texas Facilities' violations of Tex. Hum. Res. Code § 36.002(13), the State of Texas has been damaged in a significant amount to be determined at trial.

231. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the same facts as the federal claim, and asserts separate damage to the State of Texas in the operation of its Medicaid program.

## COUNT XVIII

### VIOLATIONS OF TEXAS MEDICAID FRAUD PREVENTION LAW, TEX. HUM. RES. CODE § 36.115

232. Relator re-alleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

233. Fundamental and the Texas Facilities retaliated against the Relator for refusing to engage in Fundamental's fraudulent scheme and reporting it to her superiors, as described herein. Relator was discharged from her employment, also as a result of her lawful acts done in furtherance of this action, as set forth above. This discharge was in violation Tex. Hum. Res. Code § 36.115.

234. As a direct and proximate result of this unlawful and discriminatory discharge, Relator has suffered emotional pain and mental anguish, together with serious economic hardship. Accordingly, Relator is entitled to reinstatement with the same seniority status the person would have had but for the discrimination and not less than two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained.

## COUNT XIX

### VIOLATIONS OF INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT, IND. CODE 5-11-5.5-2(b)(1)

235. Relator re-alleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

236. This is a claim for treble damages and penalties under the Indiana False Claims and Whistleblower Protection Act, Ind. Code 5-11-5.5 *et seq*.

237. Fundamental and the Indiana Facilities violated Ind. Code 5-11-5.5-2(b)(1), which makes it unlawful for any person to knowingly or intentionally present a false or fraudulent claim for payment or approval. Defendants regularly submit cost reports detailing expenses and revenues for its facilities along with the patient activity. Such cost reports are required to accurately report actual payments to suppliers, including suppliers and skilled therapy providers. The State of Indiana, by and through the State of Indiana's Medicare program, Medicaid program, and other state health care programs, and while unaware of Fundamental and the Indiana Facilities' fraudulent and illegal practices, paid the claims submitted in connection therewith.

238. Compliance with applicable federal and state laws and regulations cited herein is a material condition of payment of claims submitted to the State of Indiana.

239. Had the State of Indiana known that Fundamental and the Indiana Facilities were violating the federal and state laws cited herein, it would not have paid the claims that Fundamental and the Indiana Facilities' fraudulent and illegal practices caused to be submitted.

240. As a result of Fundamental and the Indiana Facilities' violations of Ind. Code 5-11-5.5-2(b)(1), the State of Indiana has been damaged in a significant amount to be determined at trial.

241. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the same facts as the federal claim, and asserts separate damage to the State of Indiana in the operation of its Medicare Program, Medicaid program, and other state health care programs.

## COUNT XX

### VIOLATIONS OF INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT, IND. CODE 5-11-5.5-2(b)(2)

242. Relator re-alleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

243. This is a claim for treble damages and penalties under the Indiana False Claims and Whistleblower Protection Act, Ind. Code 5-11-5.5 *et seq*.

244. Fundamental and the Indiana Facilities violated Ind. Code 5-11-5.5-2(b)(2), which makes it unlawful for any person to knowingly or intentionally make or use a false record or statement to obtain payment or approval of a false claim from the state. As set forth above, Defendants fraudulently admit patients who are not appropriate for admission, and in so doing inappropriately manipulate patient records to falsely reflect that the patient is eligible and appropriate for Defendants' care. The State of Indiana, by and through the State of Indiana's Medicare program, Medicaid program, and other state health care programs, and while unaware of Fundamental and the Indiana Facilities' fraudulent and illegal practices, paid the claims submitted in connection therewith.

245. Compliance with applicable federal and state laws and regulations cited herein is a material condition of payment of claims submitted to the State of Indiana.

60

246.    Had the State of Indiana known that Fundamental and the Indiana Facilities were violating the federal and state laws cited herein, it would not have paid the claims that Fundamental and the Indiana Facilities' fraudulent and illegal practices caused to be submitted.

247.    As a result of Fundamental and the Indiana Facilities' violations of Ind. Code 5-11-5.5-2(b)(2), the State of Indiana has been damaged in a significant amount to be determined at trial.

248.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the same facts as the federal claim, and asserts separate damage to the State of Indiana in the operation of its Medicare Program, Medicaid program, and other state health care programs.

### COUNT XXI

### VIOLATIONS OF INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT, IND. CODE 5-11-5.5-2(b)(7)

249.    Relator re-alleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

250.    This is a claim for treble damages and penalties under the Indiana False Claims and Whistleblower Protection Act, Ind. Code 5-11-5.5 *et seq*.

251.    By engaging in the misconduct alleged herein, Fundamental and the Indiana Facilities conspired with one another to violate Ind. Code 5-11-5.5-2(b)(1) and (b)(2), in violation of Ind. Code 5-11-5.5-2(b)(7).

252.    Compliance with applicable federal and state laws and regulations cited herein is a material condition of payment of claims submitted to the State of Indiana.

253.    Fundamental and the Indiana Facilities knew it was unlawful to violate or cause another to violate the Indiana False Claims and Whistleblower Protection Act and that it was

unlawful to submit claims to the Medicare program, Medicaid program, and other state health care programs for therapy services that were not reasonable or medically necessary.

254.    As a result of Fundamental and the Indiana Facilities' violations of Ind. Code 5-11-5.5-2(b)(7), the State of Indiana has been damaged in a significant amount to be determined at trial.

255.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the same facts as the federal claim, and asserts separate damage to the State of Indiana in the operation of its Medicare Program, Medicaid program, and other state health care programs.

## COUNT XXII

### VIOLATIONS OF NEW MEXICO MEDICAID FALSE CLAIMS ACT, N.M. STAT. § 27-14-4(A)

256.    Relator re-alleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

257.    This is a claim for treble damages and penalties under the New Mexico Medicaid False Claims Act, N.M. Stat. § 27-14-1 *et seq.*

258.    Fundamental and the New Mexico Facilities violated N.M. Stat. § 27-14-4(A), which makes it unlawful for any person to present, or cause to be presented, to the state a claim for payment under the Medicaid program knowing that such claim is false or fraudulent. Defendants regularly submit cost reports detailing expenses and revenues for its facilities along with the patient activity.  Such cost reports are required to accurately report actual payments to suppliers, including skilled therapy providers.  The State of New Mexico, by and through the State of New Mexico's Medicare Program, Medicaid program, and other state health care programs, and

while unaware of Fundamental and the New Mexico Facilities' fraudulent and illegal practices, paid the claims submitted in connection therewith.

259.     Compliance with applicable federal and state laws and regulations cited herein is a material condition of payment of claims submitted to the State of New Mexico.

260.     Had the State of New Mexico known that Fundamental and the New Mexico Facilities were violating the federal and state laws cited herein, it would not have paid the claims that Fundamental and the New Mexico Facilities' fraudulent and illegal practices caused to be submitted.

261.     As a result of Fundamental and the New Mexico Facilities' violations of N.M. Stat. § 27-14-4(A), the State of New Mexico has been damaged in a significant amount to be determined at trial.

262.     This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the same facts as the federal claim, and asserts separate damage to the State of New Mexico in the operation of its Medicare Program, Medicaid program, and other state health care programs.

## COUNT XXIII

### VIOLATIONS OF NEW MEXICO MEDICAID FALSE CLAIMS ACT, N.M. STAT. § 27-14-4(B)

263.     Relator re-alleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

264.     This is a claim for treble damages and penalties under the New Mexico Medicaid False Claims Act, N.M. Stat. § 27-14-1 *et seq.*

265.     Fundamental and the New Mexico Facilities violated N.M. Stat. § 27-14-4(B), which makes it unlawful for any person to present, or cause to be presented, to the state a claim

63

for payment under the Medicaid program knowing that the person receiving a Medicaid benefit or payment is not authorized or is not eligible for a benefit under the Medicaid program. As set forth above, Defendants fraudulently admit patients who are not appropriate for admission, and in so doing inappropriately manipulate patient records to falsely reflect that the patient is eligible and appropriate for Defendants' care. The State of New Mexico, by and through the State of New Mexico's Medicare Program, Medicaid program, and other state health care programs, and while unaware of Fundamental and the New Mexico Facilities' fraudulent and illegal practices, paid the claims submitted in connection therewith.

266. Compliance with applicable federal and state laws and regulations cited herein is a material condition of payment of claims submitted to the State of New Mexico.

267. Had the State of New Mexico known that Fundamental and the New Mexico Facilities were violating the federal and state laws cited herein, it would not have paid the claims that Fundamental and the New Mexico Facilities' fraudulent and illegal practices caused to be submitted.

268. As a result of Fundamental and the New Mexico Facilities' violations of N.M. Stat. § 27-14-4(B), the State of New Mexico has been damaged in a significant amount to be determined at trial.

269. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the same facts as the federal claim, and asserts separate damage to the State of New Mexico in the operation of its Medicare Program, Medicaid program, and other state health care programs.

## COUNT XXIV

### VIOLATIONS OF NEW MEXICO MEDICAID FALSE CLAIMS ACT, N.M. STAT. § 27-14-4(C)

270. Relator re-alleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

271. This is a claim for treble damages and penalties under the New Mexico Medicaid False Claims Act, N.M. Stat. § 27-14-1 *et seq.*

272. Fundamental and the New Mexico Facilities violated N.M. Stat. § 27-14-4(C), which makes it unlawful for any person to make, use or cause to be made or used a record or statement to obtain a false or fraudulent claim under the Medicaid program paid for or approved by the state knowing such record or statement is false. As set forth above, Defendants fraudulently admit patients who are not appropriate for admission, and in so doing inappropriately manipulate patient records to falsely reflect that the patient is eligible and appropriate for Defendants' care. The State of New Mexico, by and through the State of New Mexico's Medicare Program, Medicaid program, and other state health care programs, and while unaware of Fundamental and the New Mexico Facilities' fraudulent and illegal practices, paid the claims submitted in connection therewith.

273. Compliance with applicable federal and state laws and regulations cited herein is a material condition of payment of claims submitted to the State of New Mexico.

274. Had the State of New Mexico known that Fundamental and the New Mexico Facilities were violating the federal and state laws cited herein, it would not have paid the claims that Fundamental and the New Mexico Facilities' fraudulent and illegal practices caused to be submitted.

65

275.    As a result of Fundamental and the New Mexico Facilities' violations of N.M. Stat. § 27-14-4(C), the State of New Mexico has been damaged in a significant amount to be determined at trial.

276.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the same facts as the federal claim, and asserts separate damage to the State of New Mexico in the operation of its Medicare Program, Medicaid program, and other state health care programs.

## COUNT XXV

### VIOLATIONS OF NEW MEXICO MEDICAID FALSE CLAIMS ACT, N.M. STAT. § 27-14-4(D)

277.    Relator re-alleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

278.    This is a claim for treble damages and penalties under the New Mexico Medicaid False Claims Act, N.M. Stat. § 27-14-1 *et seq.*

279.    By engaging in the misconduct alleged herein, Fundamental and the New Mexico Facilities conspired with one another to violate N.M. Stat. § 27-14-4(A), (B), and (C), in violation of N.M. Stat. § 27-14-4(D).

280.    Compliance with applicable federal and state laws and regulations cited herein is a material condition of payment of claims submitted to the State of New Mexico.

281.    Fundamental and the New Mexico Facilities knew it was unlawful to violate or cause another to violate the New Mexico Medicaid False Claims Act and that it was unlawful to submit claims to Medicare Program, Medicaid program, and other state health care programs for therapy services that were not reasonable or medically necessary.

66

282.    As a result of Fundamental and the New Mexico Facilities' violations of N.M. Stat. § 27-14-4(D), the State of New Mexico has been damaged in a significant amount to be determined at trial.

283.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the same facts as the federal claim, and asserts separate damage to the State of New Mexico in the operation of its Medicare Program, Medicaid program, and other state health care programs.

**COUNT XXVI**

**VIOLATIONS OF NEW MEXICO FRAUD AGAINST TAXPAYERS ACT, N.M. STAT. § 44-9-3(A)(1)**

284.    Relator re-alleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

285.    This is a claim for treble damages and penalties under the New Mexico Fraud Against Taxpayers Act, N.M. Stat. § 44-9-1 *et seq*.

286.    Fundamental and the New Mexico Facilities violated N.M. Stat. § 44-9-3(A)(1), which makes it unlawful for any person to knowingly present, or cause to be presented, to an employee, officer or agent of the state or a political subdivision or to a contractor, grantee or other recipient of state or political subdivision funds a false or fraudulent claim for payment or approval. Defendants regularly submit cost reports detailing expenses and revenues for its facilities along with the patient activity.  Such cost reports are required to accurately report actual payments to suppliers, including skilled therapy providers.  The State of New Mexico, by and through the State of New Mexico's Medicare Program, Medicaid program, and other state health care programs, and while unaware of Fundamental and the New Mexico Facilities' fraudulent and illegal practices, paid the claims submitted in connection therewith.

287. Compliance with applicable federal and state laws and regulations cited herein is a material condition of payment of claims submitted to the State of New Mexico.

288. Had the State of New Mexico known that Fundamental and the New Mexico Facilities were violating the federal and state laws cited herein, it would not have paid the claims that Fundamental and the New Mexico Facilities' fraudulent and illegal practices caused to be submitted.

289. As a result of Fundamental and the New Mexico Facilities' violations of N.M. Stat. § 44-9-3(A)(1), the State of New Mexico has been damaged in a significant amount to be determined at trial.

290. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the same facts as the federal claim, and asserts separate damage to the State of New Mexico in the operation of its Medicare Program, Medicaid program, and other state health care programs.

## COUNT XXVII

### VIOLATIONS OF NEW MEXICO FRAUD AGAINST TAXPAYERS ACT, N.M. STAT. § 44-9-3(A)(2)

291. Relator re-alleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

292. This is a claim for treble damages and penalties under the New Mexico Fraud Against Taxpayers Act, N.M. Stat. § 44-9-1 *et seq*.

293. Fundamental and the New Mexico Facilities violated N.M. Stat. § 44-9-3(A)(2), which makes it unlawful for any person to knowingly make or use, or cause to be made or used, a false, misleading or fraudulent record or statement to obtain or support the approval of or the payment on a false or fraudulent claim. As set forth above, Defendants fraudulently admit patients

68

who are not appropriate for admission, and in so doing inappropriately manipulate patient records to falsely reflect that the patient is eligible and appropriate for Defendants' care.  The State of New Mexico, by and through the State of New Mexico's Medicare Program, Medicaid program, and other state health care programs, and while unaware of Fundamental and the New Mexico Facilities' fraudulent and illegal practices, paid the claims submitted in connection therewith.

294.   Compliance with applicable federal and state laws and regulations cited herein is a material condition of payment of claims submitted to the State of New Mexico.

295.   Had the State of New Mexico known that Fundamental and the New Mexico Facilities were violating the federal and state laws cited herein, it would not have paid the claims that Fundamental and the New Mexico Facilities' fraudulent and illegal practices caused to be submitted.

296.   As a result of Fundamental and the New Mexico Facilities' violations of N.M. Stat. § 44-9-3(A)(2), the State of New Mexico has been damaged in a significant amount to be determined at trial.

297.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the same facts as the federal claim, and asserts separate damage to the State of New Mexico in the operation of its Medicare Program, Medicaid program, and other state health care programs.

### COUNT XXVIII

### VIOLATIONS OF NEW MEXICO FRAUD AGAINST TAXPAYERS ACT, N.M. STAT. § 44-9-3(A)(3)

298.   Relator re-alleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

299. This is a claim for treble damages and penalties under the New Mexico Fraud Against Taxpayers Act, N.M. Stat. § 44-9-1 *et seq*.

300. By engaging in the misconduct alleged herein, Fundamental and the New Mexico Facilities conspired with one another to violate N.M. Stat. § 44-9-3(A)(1) and (2), in violation of N.M. Stat. § 44-9-3(A)(3).

301. Compliance with applicable federal and state laws and regulations cited herein is a material condition of payment of claims submitted to the State of New Mexico.

302. Fundamental and the New Mexico Facilities knew it was unlawful to violate or cause another to violate the New Mexico Fraud Against Taxpayers Act and that it was unlawful to submit claims to Medicare Program, Medicaid program, and other state health care programs for therapy services that were not reasonable or medically necessary.

303. As a result of Fundamental and the New Mexico Facilities' violations of N.M. Stat. § 44-9-3(A)(3), the State of New Mexico has been damaged in a significant amount to be determined at trial.

304. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the same facts as the federal claim, and asserts separate damage to the State of New Mexico in the operation of its Medicare Program, Medicaid program, and other state health care programs.

### COUNT XXIX

**VIOLATIONS OF MARYLAND FALSE HEALTH CLAIMS ACT,**
**MD. CODE HEALTH – GENERAL § 2-602(a)(1)**

305. Relator re-alleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

306.    This is a claim for treble damages and penalties under the Maryland False Health Claims Act, Md. Code Health – General § 2-601 *et seq*.

307.    Fundamental and the Maryland Facilities violated Md. Code Health–General § 2-602(a)(1), which makes it unlawful for any person to knowingly present a false or fraudulent claim for payment or approval.  Defendants regularly submit cost reports detailing expenses and revenues for its facilities along with the patient activity.  Such cost reports are required to accurately report actual payments to suppliers, including skilled therapy providers. The State of Maryland, by and through the State of Maryland's Medicaid program and other state health care programs, and while unaware of Fundamental and the Maryland Facilities' fraudulent and illegal practices, paid the claims submitted in connection therewith.

308.    Compliance with applicable federal and state laws and regulations cited herein is a material condition of payment of claims submitted to the State of Maryland.

309.    Had the State of Maryland known that Fundamental and the Maryland Facilities was violating the federal and state laws cited herein, it would not have paid the claims that Fundamental and the Maryland Facilities' fraudulent and illegal practices caused to be submitted.

310.    As a result of Fundamental and the Maryland Facilities' violations of Md. Code Health–General § 2-602(a)(1), the State of Maryland has been damaged in a significant amount to be determined at trial.

311.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the same facts as the federal claim, and asserts separate damage to the State of Maryland in the operation of its Medicaid and other state health care programs.

## COUNT XXX

### VIOLATIONS OF MARYLAND FALSE HEALTH CLAIMS ACT,
### MD. CODE HEALTH – GENERAL § 2-602(a)(2)

312.   Relator re-alleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

313.   This is a claim for treble damages and penalties under the Maryland False Health Claims Act, Md. Code Health – General § 2-601 *et seq*.

314.   Fundamental and the Maryland Facilities violated Md. Code Health–General § 2-602(a)(2), which makes it unlawful for any person to knowingly make or use a false record or statement that is material to a false or fraudulent claim.   As set forth above, Defendants fraudulently admit patients who are not appropriate for admission, and in so doing inappropriately manipulate patient records to falsely reflect that the patient is eligible and appropriate for Defendants' care.   The State of Maryland, by and through the State of Maryland's Medicaid program and other state health care programs, and while unaware of Fundamental and the Maryland Facilities' fraudulent and illegal practices, paid the claims submitted in connection therewith.

315.   Compliance with applicable federal and state laws and regulations cited herein is a material condition of payment of claims submitted to the State of Maryland.

316.   Had the State of Maryland known that Fundamental and the Maryland Facilities was violating the federal and state laws cited herein, it would not have paid the claims that Fundamental and the Maryland Facilities' fraudulent and illegal practices caused to be submitted.

317.   As a result of Fundamental and the Maryland Facilities' violations of Md. Code Health–General § 2-602(a)(2), the State of Maryland has been damaged in a significant amount to be determined at trial.

72

318.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the same facts as the federal claim, and asserts separate damage to the State of Maryland in the operation of its Medicaid and other state health care programs.

## COUNT XXXI

### VIOLATIONS OF MARYLAND FALSE HEALTH CLAIMS ACT, MD. CODE HEALTH – GENERAL § 2-602(a)(3)

319.    Relator re-alleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

320.    This is a claim for treble damages and penalties under the Maryland False Health Claims Act, Md. Code Health – General § 2-601 *et seq.*

321.    By engaging in the misconduct alleged herein, Fundamental and the Maryland Facilities conspired with one another to violate Md. Code Health–General § 2-602(a)(1) and (2), in violation of Md. Code Health–General § 2-602(a)(3).

322.    Compliance with applicable federal and state laws and regulations cited herein is a material condition of payment of claims submitted to the State of Maryland.

323.    Fundamental and the Maryland Facilities knew it was unlawful to violate or cause another to violate the Maryland False Health Claims Act and that it was unlawful to submit claims to Medicaid program and other state health care programs for therapy services that were not reasonable or medically necessary.

324.    As a result of Fundamental and the Maryland Facilities' violations of Md. Code Health–General § 2-602(a)(3), the State of Maryland has been damaged in a significant amount to be determined at trial.

325. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the same facts as the federal claim, and asserts separate damage to the State of Maryland in the operation of its Medicaid and other state health care programs.

### PRAYER FOR RELIEF

WHEREFORE, Relator respectfully requests this Court to award judgment of the following to the Plaintiffs and against Fundamental:

326. To the UNITED STATES:

a. Three times the amount of damages which the United States has sustained as a result of Defendants' fraudulent and illegal practices; and,

b. The maximum civil penalty allowed by law for each false or fraudulent claim that Defendant caused, presented or caused to be presented for payment or approval, and for each false record or statement made, used, or caused to be made or used by Defendant and material to a false or fraudulent claim; and,

c. Prejudgment interest; and,

d. All costs incurred in bringing this action; and,

e. Such further relief as this Court deems equitable and just.

327. To the INDIVIDUAL STATE PLAINTIFFS:

a. All damages which the individual states have sustained as a result of Defendants' fraudulent and illegal practices; and,

b. All damages and penalties allowed by the statutes applicable to each of the individual state plaintiffs; and,

c. Prejudgment interest; and,

d. All costs incurred in bringing this action; and,

e. Such further relief as this Court deems reasonable and just.

328.   To RELATOR:

    a.   The maximum Relator's share allowed under the FCA; and,

    b.   The maximum Relator's share allowed under each of the individual state analogues to the FCA; and

    c.   Not less than two times the amount of backpay from the time of her termination to the final adjudication of this action, and interest on such back pay;

    d.   Compensation for any special damages sustained as a result of her termination; and

    e.   Reinstatement at her previous title, seniority status and wage; and,

    f.   Reimbursement for reasonable expenses that Relator incurred in connection with this action; and,

    g.   An award of reasonable attorneys' fees and costs; and,

    h.   Such further relief as this Court deems equitable and just.

## JURY TRIAL DEMAND

329.   Relator hereby demands a trial by jury.

75

DATED: June 19, 2017

Respectfully submitted,

**KREINDLER & ASSOCIATES**

By: _____

Mitchell R. Kreindler
mkreindler@blowthewhistle.com
9219 Katy Freeway, Suite 206
Houston, TX 77024-1514
Telephone: (713) 647-8888
Facsimile: (713) 647-8889

**MILBERG LLP**

Roland W. Riggs
rriggs@milberg.com
Christopher Schuyler
cschuyler@milberg.com
One Pennsylvania Plaza
New York, New York 10119-0165
Telephone: (212) 594-5300
Facsimile: (212) 868-1229

*Attorneys for Relator*